**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 11-cv-02963-JLK

CHARLES M. KRUTSINGER,

      Petitioner,

v.

DEAN WILLIAMS, Executive Director, Colorado Department of Corrections; and
PHILIP J. WEISER, Attorney General of the State of Colorado,

      Respondents.

---

**MEMORANDUM OPINION AND ORDER**

---

Kane, J.

      The U.S. Supreme Court has described the writ of habeas corpus as "the fundamental instrument for safeguarding individual freedom against arbitrary and lawless state action." *Harris v. Nelson*, 394 U.S. 286, 290–91 (1969). With roots predating the Magna Carta, habeas corpus originated as a mechanism for ensuring that prisoners are not held unlawfully. *See* Leonard Levy, *Origins of the Bill of Rights* at 44 (2001). The writ was assumed in the drafting of the U.S. Constitution, *see* U.S. Const. art. 1, § 9, cl. 2, and officially instituted in the U.S. with the Judiciary Act of 1789, § 14, 1 Stat. 73 (1789). Post-Civil War, courts were empowered by Congress to grant habeas relief "in all cases," state or federal, "where any person may be restrained of his or her liberty in violation of the constitution, or any treaty or law of the United States." Habeas Corpus Act of 1867, ch. 27, 14 Stat. 385 (1867). Despite its veneration as a "fundamental instrument," the scope of the writ has since been narrowed via the enactment of the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (1996) (imposing a highly deferential standard for claims adjudicated on the merits by the state

courts) and Supreme Court opinions such as *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993) (holding that a more forgiving harmless-error standard is to be applied in determining whether habeas relief must be granted for constitutional error of the trial type). *See* Brian R. Means, *Postconviction Remedies* § 4.5 (2020).

Petitioner Charles Krutsinger asserts several claims for relief in his Amended Petition for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 (ECF No. 24). Under the standards by which I am bound, I determine that he has not established he is entitled to relief on any of the claims and therefore deny his Amended Petition.

Mr. Krutsinger challenges his convictions related to the sexual assault of his stepdaughter, S.M. He was charged in District Court in Douglas County, Colorado, with:

- One count of Sexual Assault on a Child in violation of Colorado Revised Statutes § 18-3-405(1);

- Nine counts of Sexual Assault on a Child—Pattern of Abuse in violation of Colorado Revised Statutes § 18-3-405(1)(2)(d);

- Nine counts of Sexual Assault on a Child—Position of Trust (victim under fifteen) in violation of Colorado Revised Statutes § 18-3-405.3; and

- Ten counts of Aggravated Incest in violation of Colorado Revised Statues § 18-6-302.

Following a four-day trial and two days of deliberation, a jury found him guilty on all 29 counts.

The trial judge sentenced Mr. Krutsinger to two years of imprisonment on his conviction for Sexual Assault on a Child, ten years of imprisonment on his Pattern-of-Abuse convictions, four years of imprisonment on one of his Position-of-Trust convictions, ten years of imprisonment on his remaining Position-of-Trust convictions, and four years of imprisonment on his Aggravated-Incest convictions, all terms to run concurrently.

Mr. Krutsinger's appeals and attempts at postconviction relief in the state courts lasted fifteen years and resulted in four Colorado Court of Appeals opinions and one Colorado Supreme Court opinion as well as additional hearings in the district court over four days. Although Mr. Krutsinger finished serving his sentence years ago, he persists in his efforts to overturn his convictions. His original Petition in this case was filed in November 2011, but the case was stayed as Mr. Krutsinger continued to pursue relief in the state courts. His efforts there ultimately proved unsuccessful. Consequently, the stay was lifted in this case in November 2018, and the parties were permitted to amend their filings. After my colleague Judge Matsch's passing in May 2019, the case was reassigned to me. I held oral argument in August 2019 to gain clarity on the numerous and complicated issues Mr. Krutsinger advances.

Mr. Krutsinger's Amended Petition in this case asserts four claims for habeas relief. First, he argues that the trial court violated his Sixth Amendment rights to present a defense, to compulsory process, and to a fair trial by excluding the testimony of S.M.'s therapist, Dr. Patricia Howard. Second, he contends that his constitutional rights to due process and a fair trial were violated when the prosecutor misrepresented a key fact and inappropriately bolstered S.M.'s credibility during closing arguments. Third, Mr. Krutsinger claims that the cumulative instances of prosecutorial misconduct during closing arguments violated his constitutional rights to due process, the presumption of innocence, and a fair trial. And, lastly, he maintains that his trial attorney provided ineffective assistance of counsel.

# I. Background

*Mr. Krutsinger's Trial*

As is often the case with allegations of child sexual abuse, no physical evidence of the abuse was presented at Mr. Krutsinger's trial and no witness testified to the incidents other than the victim, S.M. The outcome of the trial hinged entirely on credibility—primarily S.M.'s but also Mr. Krutsinger's. The prosecution supported S.M.'s statements with the testimony of her mother, Roberta Krutsinger; the school counselor to whom she disclosed the abuse, Michael Lantz; the officers involved in her interviews after that disclosure, Douglas County Deputy Sheriffs Jeffrey Egnor and Brock Bowers; and expert witness Marte McNally. The defense challenged S.M.'s testimony by showing the inconsistencies in her various accounts of the abuse and by offering motives for why she would have fabricated the allegations. Some of the motives suggested were that she was covering for her own bad behavior, that she wished to go live with her father on the Colville Reservation in Washington State, and that she wanted to separate her mother from Mr. Krutsinger.

The prosecution started the four-day trial with S.M.'s testimony. She alleged that Mr. Krutsinger sexually abused her from when she was in second grade to when she was in sixth grade. 8/19/2003 Trial Tr. 57:23-58:1, 71:17-72:2, ECF No. 33. S.M. was a junior in high school when she disclosed the abuse and was 16 at the time of the trial. According to S.M., Mr. Krutsinger abused her in two different ways: by putting her hand in his pants and making her stimulate his penis, *id.* 58:6-12, 59:1-5, 62:5-19, and by rubbing his erect penis up against her backside while clothed, *id.* 64:12-66:4. She testified that Mr. Krutsinger engaged in the first type of abuse three or four times per week over the approximately five-year period and that in total there were more than a hundred instances. *Id.* 60:6-8, 67:1-2. With respect to the second type of

4

abuse, she testified that it started when she was in third grade and occurred once a week or every

other week until she was in sixth grade. *Id.* 65:6-7, 66:8-9. On the stand, S.M. reported that the

first time the abuse occurred was in their family room while she was watching cartoons one

morning before she went to school. *Id.* 61:10-20. She stated that, when the abuse occurred in the

mornings, Mr. Krutsinger would be wearing his work clothes, including suit pants. *Id.* 62:1-4;

8/20/2003 Trial Tr. 16:25-17:3, 18:13-20, ECF No. 33. The last incident of abuse, per her

testimony, took place in the middle of the night and involved Mr. Krutsinger putting her hand in

his pants. 8/19/2003 Trial Tr. 71:22-72:9.

On the stand, S.M. described how for years she had told Mrs. Krutsinger that she had a

secret but that she was always too scared to tell her mother what the secret was. *Id.* 77:11-79:11.

Similarly, S.M. testified that she had hinted to her high school counselor, Michael Lantz, about

the abuse, but that she had not named the perpetrator because Mr. Lantz had warned her he

would then have to report the abuse. *Id.* 96:9-17; 8/20/2003 Trial Tr. 65:24-66:1.[1]

Ultimately, more than five years after the last alleged incident of abuse, S.M. revealed her

secret to her mother outside of a bowling alley. That night, S.M. drove to go midnight bowling

without permission. When confronted by her mother at the bowling alley, S.M. disclosed that she

had been sexually abused. 8/19/2003 Trial Tr. 83:1-7, 84:21-86:24. S.M. testified that, during

that disclosure, she only told her mother that she had been molested and not who she thought had

done it. *Id.* 86:13-18; 8/20/2003 Trial Tr. 61:15-17. After their conversation, Mrs. Krutsinger

---

[1]S.M. told Officer Egnor that, at the time the abuse was occurring, she disclosed it to her close
friend Jessica Slabach. 8/21/2003 Trial Tr. 22:3-7, ECF No. 33. At trial, however, S.M. stated
that she merely told Ms. Slabach "[s]omething wrong is always happening." 8/19/2003 Trial Tr.
73:17-21, 74:12-23. Ms. Slabach testified afterwards and denied that S.M. ever mentioned being
frightened by what was going on in her house or anything about sexual abuse. 8/20/2003 Trial
Tr. 177:15-18, 178:17-19.

allowed S.M. to stay for midnight bowling but arranged for S.M. to see a therapist a few weeks later.

S.M. saw psychologist Patricia Howard on four occasions. At the first session, on October 31, 2002, S.M. told Dr. Howard that she had been abused but that she was not certain who the perpetrator was. S.M. explained at trial that, in fact, she knew Mr. Krutsinger had abused her but did not tell Dr. Howard because, like Mr. Lantz, Dr. Howard had warned that a case would have to be filed immediately if she stated who had abused her. 8/19/2003 Trial Tr. 91:24-92:2; 8/20/2003 Trial Tr. 64:15-25. S.M. testified that she was not "ready at that point for [Dr. Howard] to do that." 08/19/2003 Trial Tr. 91:6–92:12. Dr. Howard's notes from that first session document that S.M. told her the abuse ended when S.M. was in fourth grade. Defense counsel used these notes to question S.M. on the inconsistency in her timeline,[2] but S.M. responded that she only remembered telling everyone the abuse ended when she was in sixth grade. 8/20/2003 Trial Tr. 64:7-12.

The day after S.M.'s first session with Dr. Howard, Mrs. Krutsinger took a trip to Washington State for six days. S.M. was left at home with Mr. Krutsinger during that time. They went to see a movie together, and S.M. only remembered them getting in one fight—about whether she was smoking cigarettes. 8/19/2003 Trial Tr. 88:1-13. One night while Mrs. Krutsinger was gone, S.M. phoned her around 11 p.m. and confessed that she remembered it was Mr. Krutsinger who had abused her. *Id.* 84:1-6; 8/20/2003 Trial Tr. 77:20-23. Mrs. Krutsinger offered to come home immediately, but S.M. indicated that was not necessary. *Id.* 80:15-20. Mrs. Krutsinger returned two days later. S.M. testified that she did not discuss the abuse again with her mother for another full day because she was still scared of telling her. 8/19/2003 Trial Tr.

---

[2]Dr. Howard's notes were not admitted into evidence at trial.

93:2-8. When Mrs. Krutsinger finally pressed S.M. to talk, S.M. struggled to reveal the details of the abuse, so she wrote them down on a sheet of paper. *Id.* 94:1-11. Mrs. Krutsinger read what S.M. wrote and responded by tearing up the sheet of paper and asking for a couple of weeks to come up with a plan. *Id.* 95:3-12.

Because S.M. "want[ed] to get something happening," she went to school the following day, November 8, 2002, and disclosed the abuse to her school counselor, Mr. Lantz. *Id.* 95:13-22. Abiding by his duty to report under Colorado law, Mr. Lantz called in the school resource officer, Deputy Sheriff Egnor, who came and interviewed S.M. A few days later, Deputy Sheriff Bowers scheduled a forensic interview for S.M. at the Sungate Child Advocacy Center.

Mrs. Krutsinger's testimony at trial focused on her relationship with Mr. Krutsinger and S.M.'s disclosure of the abuse. Mrs. Krutsinger described the fights she and Mr. Krutsinger frequently had in which he had shoved her and put holes in the wall. 8/20/2020 Trial Tr. 109:4-111:6. Mrs. Krutsinger corroborated that S.M. told her for many years that she had a secret she was hiding but was never able to divulge what it was. *Id.* 113:12-117:18. Mrs. Krutsinger also confirmed that S.M. first disclosed the sexual abuse to her in the fall of 2002 in the parking lot of the bowling alley. Mrs. Krutsinger's memory of the specifics of that conversation, however, differed significantly from S.M.'s testimony. Mrs. Krutsinger testified that, during their conversation, S.M. did reveal who she thought the perpetrator was. *Id.* 122:24-123:13. According to Mrs. Krutsinger, S.M. stated that she thought Mr. Krutsinger could have been the one who abused her but walked back that accusation when questioned on it. *Id.* Mrs. Krutsinger further testified that she shared the details of their conversation with Mr. Krutsinger, including S.M.'s uncertainty about his involvement and her own disbelief that he could have done it. *Id.* 124:14-25.

Mr. Lantz gave testimony on his role as S.M.'s school counselor and her disclosure of the abuse to him. He testified that he noticed a change in S.M.'s demeanor when she told him that Mr. Krutsinger had sexually abused her, and he believed it was because "her defenses had come down and she was allowing [him] to see what she was feeling." 8/20/2003 Trial Tr. 185:16-186:12, 189:11-15, 193:15-21. He also corroborated that the previous year, S.M. had told him she had something she was trying to remember but wasn't ready to remember yet. *Id.* 187:12-15. But he testified that she never mentioned sexual assault before. *Id.* 199:6-7. Lastly, Mr. Lantz contradicted S.M.'s testimony, denying that he advised her not to tell him who had abused her or else he would have to report the abuse. *Id.* 198:22-199:1.

Deputy Sheriff Egnor testified regarding his initial interview of S.M. at her high school. He was questioned on his report of the interview, which documented that S.M. had told him Mr. Krutsinger often wore sweatpants and sometimes ejaculated during the abuse. 8/21/2003 Trial Tr. 13:18-25, 14:3-15:11.

Deputy Sheriff Bowers arranged and was the custodian of the video of S.M.'s forensic interview at Sungate. That video was shown to the jury without objection from defense counsel. S.M.'s testimony at trial differed from her statements in the interview in several respects:  how the abuse first occurred, what Mr. Krutsinger wore during the abuse, how often it occurred, the circumstances of the last incident of abuse, whether he ejaculated, and whether he made any noises during it. 8/20/2003 Trial Tr. 24:24-25:12 (stating in the interview that the first incident of abuse involved Mr. Krutsinger humping her from behind but testifying that in the first incident he put her hand down his pants); *id.* 25:16-27:5 (stating in the interview that Mr. Krutsinger always wore sweatpants when the abuse occurred but testifying that he wore suits when it

happened);[3] *id.* 31:2-31:19 (stating in the interview that Mr. Krutsinger made her stimulate his penis once or twice a month but testifying that he made her do so three or four times per week); *id.* 38:2-39:25 (stating in the interview that the last incident was when Mr. Krutsinger humped her from behind during a barbecue at their house but testifying that it was when he forced her hand down his pants in the middle of the night); *id.* 20:1-22:16 (stating in the interview that she didn't know if Mr. Krutsinger ejaculated during the abuse and that his penis was wet from sweat but testifying that he did ejaculate); 8/19/2003 Trial Tr. 67:14-22 (stating in the interview that Mr. Krutsinger would moan and groan during the abuse but testifying that he did not make noises). In the video, S.M. also recounted that Mr. Krutsinger had been violent toward her mother.

To conclude its case, the prosecution called Ms. McNally, the Director of Counseling Services at the Rape Assistance and Awareness Program. Without objection from the defense, Ms. McNally was qualified as an expert in "the psychology of sexual assault victims." 8/21/2003 Trial Tr. 45:21-25. She testified as to the multitude of ways she had seen victims of sexual abuse make disclosures and respond to the abuse. She explained that children often engage in subtle outcry, in which they feel they have made a disclosure to someone even though the other person does not believe they did. She also described how children frequently test the waters to predict what the response will be to their disclosure. And, when victims of child abuse do reveal the abuse, she testified that it is usually delayed and often the details are "jumbled" due to disassociation. *Id.* 55:10-15, 56:8-22. The defense discredited Ms. McNally's testimony by highlighting that she knew nothing about Mr. Krutsinger's case and succeeded in having her

---

[3]Mrs. Krutsinger's testimony revealed additional inconsistencies regarding what Mr. Krutsinger would wear during the abuse. 8/20/2020 Trial Tr. 132:8-11 (stating that S.M. told her Mr. Krutsinger always wore sweatpants when it happened).

admit that she believes all conduct is consistent with having experienced sexual abuse. *Id.* 59:22-60:9, 62:15-65:8.

During its case, the defense presented the testimony of Jeanie Nelson, a close family friend of the Krutsingers, and the testimony of Mr. Krutsinger himself. Defense counsel also sought to have Dr. Howard testify, but the trial judge erroneously excluded her testimony based on the psychotherapist-patient privilege. *Id.* 96:5-99:9.

Ms. Nelson testified about her experience with S.M. after S.M. had revealed to Mrs. Krutsinger outside the bowling alley that she had been sexually abused. Mrs. Krutsinger discussed S.M.'s disclosure with Ms. Nelson and agreed it was a good idea for Ms. Nelson to spend time with S.M. *Id.* 105:18-25. As a survivor of childhood sexual abuse, Ms. Nelson believed S.M. "was at a critical juncture in her life" and wanted to help her. *Id.* 106:1-10. When Mrs. Krutsinger was in Washington State, Ms. Nelson took S.M. to dinner and a movie. After the movie, Ms. Nelson opened up to S.M. about the abuse she had suffered in an attempt to give S.M. a safe place to talk about her experience as well. *Id.* 108:5-20. When questioned about S.M.'s response to her revelation, Ms. Nelson stated that S.M. had "very little to no reaction" and did not seem interested in continuing the conversation. *Id.* 108:21-109:4. As a result, Ms. Nelson took S.M. home, where S.M. put on a video of the TV show Friends and laughed. *Id.* 108:24-109:17. Ms. Nelson testified that she felt foolish after this experience. *Id.* 108:24-25.

Mr. Krutsinger began his testimony with a brief history of his life and his relationship with Mrs. Krutsinger. He discussed their tumultuous relationship, admitting that he had yelled in her face and shoved her on multiple occasions. *Id.* 139:22-143:8, 171:12-177:4. He recalled the details of an altercation they had that led to Mrs. Krutsinger's arrest for domestic violence. *Id.* 171:12-178:1. Additionally, Mr. Krutsinger described how, from a very young age, S.M. wedged

herself between him and Mrs. Krutsinger. *Id.* 131:23-132:3, 159:25-160:8. Regarding the bowling alley disclosure, Mr. Krutsinger corroborated Mrs. Krutsinger's story. He testified that Mrs. Krutsinger told him that night that S.M. had said she had memories of a man humping her and thought it might have been Mr. Krutsinger. *Id.* 167:21-24. Mrs. Krutsinger then explained to him how she had questioned S.M. and how S.M. had agreed that maybe it wasn't Mr. Krutsinger. *Id.* 167:24-168:6. According to Mr. Krutsinger, he responded by suggesting that S.M. get counseling. *Id.* 168:7-11. He further testified that he was concerned about S.M.'s behavior in high school—that she was drinking, smoking pot, lying, doing poorly in school, and forging checks. *Id.* 162:18-164:3, 171:1-11, 185:5-18. And he talked about how he would regularly email S.M.'s teachers to check in. *Id.* 162:22-24, 164:16-165:2. Specifically, he mentioned that he emailed S.M.'s teachers while Mrs. Krutsinger was in Washington State and spoke with S.M. about an assignment that was due. *Id.* 185:19-186:1. In the end, Mr. Krutsinger explicitly denied having abused S.M. and accused her of making up the story to separate Mrs. Krutsinger from him. *Id.* 190:9-25.

During closing arguments, the prosecutor made numerous ill-advised statements, including ones that insinuated falsehoods, mischaracterized testimony, and contained ambiguous religious references. *See* 8/22/2003 Trial Tr. 22:21-24, 55:6-9, 56:15-19, 58:5-8, 60:22-25. Defense counsel did not object. During his argument, he recapped the inconsistencies in S.M.'s accounts and pointed the jury to the reasons why she would lie.

The jury deliberated over two days and returned guilty verdicts on all 29 counts charged.

*Evidence Not Presented at Trial*

Many of Mr. Krutsinger's appellate and post-conviction claims in the state courts and his claims in this case concern evidence that was not presented during his trial, including:

- The testimony of Dr. Howard,

- An email Mr. Krutsinger sent to S.M.'s teachers an hour and a half before she disclosed the sexual abuse to Mr. Lantz,

- The testimony of an expert witness who could rebut Ms. McNally's opinions,

- The testimony of Chase Crain regarding S.M.'s character, and

- The testimony of numerous witnesses as to Mr. Krutsinger's character.

The testimony of Dr. Howard was erroneously excluded by the trial court, but the rest of this evidence simply was not presented by Mr. Krutsinger's attorney.[4]

Dr. Howard's testimony was significant because it revealed additional inconsistencies in S.M.'s allegations. Mr. Krutsinger's trial attorney indicated during his opening statement and in his cross-examination of S.M. that Dr. Howard would be testifying later. 8/19/2003 Trial Tr. 38:10-13; 8/20/2003 Trial Tr. 64:4. But he was ultimately prevented from eliciting her testimony in front of the jury. *See* 8/21/2003 Trial Tr. 96:5-98:9. At a minimum, Dr. Howard would have contradicted S.M.'s claim that she had said the abuse would not have to be reported if S.M. indicated uncertainty about who the abuser was. 12/21/2005 Hr'g On Remand Tr. 61:5-17, ECF No. 33. And Dr. Howard would have confirmed the accuracy of the notes she had from two of her sessions with S.M. *Id.* 19:8-12. Those notes documented that: (1) S.M. first told Dr. Howard the sexual abuse ended when she was in fourth grade; (2) prior to their first session on October

---

[4]This evidence was presented at the 2005 hearing on remand and 2012 postconviction hearings in the district court.

31, 2002, S.M. had told her mother that Mr. Krutsinger may have abused her; (3) S.M. reported she was starting to remember more about being abused and was "almost sure" it was Mr. Krutsinger; (4) she claimed Mr. Krutsinger had been physically abusive to her mother; and (5) she stated that she would love to live on the Colville Reservation. *Id.* 26:14-15, 28:1-4, 28:13-14, 29:3-5, 37:4-6.

The jury heard substantial evidence regarding Mr. Krutsinger's communications with S.M.'s teachers, but no example of those communications was submitted as an exhibit. Mr. Krutsinger sent one particular email asking for their assistance with S.M. an hour and a half before S.M. made her sexual-abuse disclosure to Mr. Lantz. 11/8/2002 Email at 1, ECF No. 24-22. For an unknown reason, defense counsel did not offer this email as an exhibit. 4/13/2012 Postconviction Hr'g Tr. 158:23-159:1, ECF No. 33. From the record, though, it is unclear whether S.M. had any knowledge of this email before making her disclosure, and S.M. had already written the details of the abuse for her mother the night before the email was sent.

Additionally, defense counsel chose not to call an expert witness to counter the testimony of Ms. McNally. Such a witness could have testified regarding:  the frequency of false allegations of sexual abuse; the fact that mental health professionals cannot accurately discriminate between delayed disclosures that are based in fact and those that are fabricated; the nonexistence of characteristic behaviors of adolescent sexual abuse victims; the evidence disproving the theory of dissociation; how individuals remember the first and last events in a series with greater detail due to the serial position effect; individuals' avoidance response to trauma; the influence of step-family dynamics; and the improbability that an incestuous abuser would have supported a child going into therapy. *See, e.g.*, 6/15/2012 Postconviction Hr'g Tr. 49:1-50:3, 50:18-51:3, 51:20-53:19, 54:22-56:2, 56:7-19, 58:11-60:12, 60:21-62:13, ECF No. 33.

Of course, any expert would have been subject to cross-examination, and any evidence or studies discussed by that witness could have been challenged. Defense counsel also did not ask any questions of Ms. McNally regarding whether individuals make false allegations. If he had, Ms. McNally would have agreed that false allegations do occur and that some reasons for them might be mental health issues, secondary gain, or to cover up other problems. *Id.* 13:1-3, 14:8-25, 15:5-8, 17:10-14.

Defense counsel likewise did not present the testimony of Chase Crain on S.M.'s character for truthfulness. Chase Crain was a family friend and contemporary of S.M. 4/13/2012 Postconviction Hr'g Tr. 207:22-208:25. If Mr. Crain had testified, he would have stated that he believed S.M. is an untruthful person. *Id.* 209:1-8.

Finally, defense counsel made the decision not to present the testimony of any character witnesses, even though many individuals—at least 14—were willing to testify on Mr. Krutsinger's behalf. A diverse group of witnesses, including childhood friends, his former coworkers and their families, and his boss in the Air Force, would all have testified that Mr. Krutsinger was a truthful, law-abiding person who had appropriate boundaries with children.[5]

---

[5]The character witnesses presented at the postconviction hearings were:  Chase Crain, 4/13/2012 Postconviction Hr'g Tr. 210:2-15, 219:5-221:5; the Founder of Interlink Group, where Mr. Krutsinger was the "right-hand guy," *id.* 228:18-229:6, 231:3-234:13; the former CEO of Interlink Group and Mr. Krutsinger's colleague, friend, and neighbor, *id.* 236:3-5, 237:5-21, 240:20-243:25; a female direct report at Interlink Group, *id.* 246:11-23, 249:3-13, 249:14-252:9; a childhood friend who remained close with Mr. Krutsinger through all of the stages of his life, 6/15/2012 Postconviction Hr'g Tr. 91:11-95:10, 99:11-103:9; another colleague at Interlink Group, *id.* 115:14-116:1, 119:8-123:10; a couple whose children spent a lot of time with Mr. Krutsinger when they were growing up, *id.* 128:22-130:15, 132:2-134:8, 171:5-172:20, 173:14-175:4; that couple's daughter, *id.* 162:25-165:16, 166:18-167:20; another Interlink Group colleague who vacationed with the Krutsingers and volunteered with Mr. Krutsinger, *id.* 193:18-196:1, 196:22-199:4; that colleague's husband, *id.* 145:6-146:22, 150:6-151:20; Mr. Krutsinger's first cousin, *id.* 187:1-188:2, 189:3-190:22; another colleague from Interlink Group who played in a band with Mr. Krutsinger, *id.* 203:6-204:9, 205:21-207:16; and Mr. Krutsinger's boss in the Air Force, *id.* 215:3-217:9, 218:8-222:1.

Many of these individuals had professional experience judging character traits and had the opportunity to witness Mr. Krutsinger interact with and build relationships with children. One of Mr. Krutsinger's direct reports, who was sexually assaulted as a child and "very much resembled" S.M., would have testified that, although "he definitely had the opportunity and could have leveraged those opportunities to do anything," "never did [she] witness [Mr. Krutsinger] do anything that was anything but professional and ethical." *Id.* 249:3-13, 251:22-23. Other individuals would have emphasized the exceptional nature of Mr. Krutsinger's character. *See, e.g.*, *id.* 241:16-21 ("Look in the courtroom. When you think in this day and age at the nature of the accusation, most people would shy away from being associated with that, and the fact he's had an incredible support base speaks to how many lives he's touched."); 6/15/2012 Postconviction Hr'g Tr. 211:3-8 ("I don't think I have ever encountered people in my work life or my personal life that I felt more confident about, you know, in terms of their honesty, integrity, law-abiding nature than I feel about [Mr. Krutsinger]. I've just had -- I've never had any question about his character at all."); *id.* 220:12-13 ("I'd bet my life on him."). In cross-examining these witnesses, however, the prosecutor could have repeatedly stated the allegations against Mr. Krutsinger and would have forced the witnesses to admit that they were unaware of what was happening behind closed doors in the Krutsinger house. *See, e.g.*, *id.* 105:11-14, 109:13-21, 124:19-22, 157:2-9, 175:15-21, 178:20-179:1, 180:3-7, 182:7-9.[6]

---

[6]The prosecutor at the postconviction hearing on June 15, 2012, asked questions such as: "[Y]ou're aware of some allegations in this case that the defendant had sexual contact with his daughter; is that accurate?"; "[I]t's fair to say that you weren't present in the room when any of those alleged incidents may have happened?"; "[Y]ou would agree that appropriate boundaries with an 11-year-old girl is not to have sexual contact with her?"; "[Y]ou have no idea what sexual proclivities the defendant has, correct?" 6/15/2012 Postconviction Hr'g Tr. 178:20-22, 178:24-179:1, 180:4-6, 182:7-8.

*State Court Direct Appeal*

On direct appeal of his convictions, Mr. Krutsinger claimed the trial court erred in excluding Dr. Howard's testimony and that two of the prosecutor's comments during closing argument constituted plain error. The Court of Appeals found any prosecutorial misconduct did not amount to plain error, but it remanded for the district court to hold a hearing to obtain Dr. Howard's testimony and to determine whether its exclusion constituted reversible error. *People v. Krutsinger*, 121 P.3d 318, 323 (Colo. App. 2005) ("*Krutsinger I*"). The district court held the hearing on remand and concluded that exclusion of Dr. Howard's testimony did not constitute reversible error. First Order on Remand at 5, ECF No. 24-18. The Court of Appeals affirmed the district court's order. *People v. Krutsinger*, No. 06CA532 (Colo. App. April 10, 2008) (unpublished) ("*Krutsinger II*"), ECF No. 24-3. The Colorado Supreme Court granted review but similarly concluded that the exclusion of Dr. Howard's testimony "did not rise to the level of federal constitutional error" and was harmless under the state's harmless-error standard. *Krutsinger v. People*, 219 P.3d 1054, 1062-64 (Colo. 2009) ("*Krutsinger III*").

In April 2010, the Supreme Court of the United States denied Mr. Krutsinger's Petition for Certiorari.

*Postconviction Proceedings*

Mr. Krutsinger filed his Petition for Postconviction Relief Pursuant to Rule 35(c) of the Colorado Rules of Criminal Procedure in May 2011.[7] As relevant here, his Petition asserted: (1)

---

[7]Mr. Krutsinger also filed motions under Rule 35(a) and Rule 35(b) of the Colorado Rules of Criminal Procedure. *See* 35(a) Motion, ECF No. 24-7; 35(b) Motion, ECF No. 24-6. The state courts' rulings on those motions are not challenged in his Amended Petition. The district court denied the Rule 35(b) Motion, *see* Order on 35(b) Motion, ECF No. 24-8, and Mr. Krutsinger did not appeal that ruling. The Rule 35(a) Motion was granted in part, *see* 8/17/10 Order on 35(a) Motion, ECF No. 24-9; 9/2/10 Order on 35(a) Motion, ECF No. 24-10, and the Mittimus was

that cumulative instances of prosecutorial misconduct during closing argument denied him his federal constitutional rights to due process, a fair trial, and the presumption of innocence; and (2) that his trial attorney provided ineffective assistance of counsel. Rule 35(c) Petition at 2, ECF No. 24-1. At the postconviction evidentiary hearing held over three days in 2012, Mr. Krutsinger presented the testimony of numerous witnesses:  his trial counsel; Ms. McNally; an expert to rebut her testimony; an expert on the standards for the effective assistance of counsel in criminal cases in Colorado state courts; Ms. Nelson; and character witnesses. Based on that testimony, the postconviction court denied relief in a written order. 3/29/13 Rule 35(c) Order at 16, ECF No. 24-14. The Colorado Court of Appeals determined that Rule 35 did not permit it to review Mr. Krutsinger's "revised and expanded argument that he was denied due process as a result of multiple instances of prosecutorial misconduct during closing argument." *People v. Krutsinger*, No. 13CA900 (Nov. 12, 2015) (unpublished) ("*Krutsinger IV*"), 28-29, ECF No. 24-15. And, on Mr. Krutsinger's ineffective-assistance-of-counsel claim, it affirmed the postconviction court's order in part and remanded for further findings on two of the errors counsel was alleged to have committed. *Id.* at 28. On remand, the postconviction court again denied relief. Rule 35(c) Order on Remand at 14, ECF No. 24-16. In October 2018, the Court of Appeals affirmed that decision, issuing the final state court order in Mr. Krutsinger's case. *People v. Krutsinger*, No. 16CA2217 (Oct. 11, 2018) (unpublished) ("*Krutsinger V*"), 25, ECF No. 24-17.

Because Mr. Krutsinger was required to file his habeas corpus petition within one year after his convictions became final on direct appeal, *see* 28 U.S.C. § 2244(d)(1)(A), he filed his original Petition in this case on November 15, 2011.[8]

---

amended, *see* First Amended Mittimus, ECF No. 24-11; Second Amended Mittimus ECF No. 24-12. Mr. Krutsinger did not appeal the partial denial of his Rule 35(a) Motion.

[8] I find, and Respondents do not contend otherwise, that Mr. Krutsinger's Petition is timely under 28 U.S.C. § 2244(d)(1)(A).

## II. Habeas Corpus Standard

The Antiterrorism and Effective Death Penalty Act (AEDPA) "requires a state prisoner seeking federal habeas relief first to 'exhaus[t] the remedies available in the courts of the State.'" *Kernan v. Hinojosa*, 136 S. Ct. 1603, 1604 (2016) (per curiam) (quoting 28 U.S.C. § 2254(b)(1)(A)). Then, as the Supreme Court has underscored, the Act "imposes a highly deferential standard for evaluating state-court rulings, and demands that state-court decisions be given the benefit of the doubt." *Renico v. Lett,* 559 U.S. 766, 773 (2010) (internal quotation marks and citations omitted). Federal courts are only freed from the Act's strictures when the state courts have not adjudicated the petitioner's federal claim on the merits. *See Kernan*, 136 S. Ct. at 1604.

*Deferential Review*

When the state courts have addressed a petitioner's claim on the merits, habeas relief is appropriate if the adjudication by the state courts:

> (1) resulted in a decision that was **contrary to**, or involved **an unreasonable application of**, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on **an unreasonable determination of the facts** in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (emphasis added).

A decision is **contrary to clearly established Federal law** "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law" or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [the Supreme Court's]." *Williams v. Taylor*, 529 U.S.

362, 405 (2000) (O'Connor, J., concurring in the judgment of the Court and delivering the opinion of the Court as to Part II).

A decision involves **an unreasonable application of clearly established Federal law** if the state court "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." *Id.* at 407-08. The reasonableness of a decision, *vel non*, is determined by reference to an objective standard. *Id.* at 409. "[A] state court's application of federal law is only unreasonable if 'all fairminded [sic] jurists would agree the state court decision was incorrect.'" *Wood v. Carpenter*, 907 F.3d 1279, 1289 (10th Cir. 2018) (quoting *Frost v. Pryor*, 749 F.3d 1212, 1225 (10th Cir. 2014)).[9]

A decision is not based on **an unreasonable determination of the facts** "merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). The Supreme Court has warned, "even if reasonable minds reviewing the record might disagree about the finding in question, on habeas review that does not suffice to supersede the trial court's determination." *Id.* (internal quotation marks, citation, and alteration omitted). The Tenth Circuit has elaborated that a state court unreasonably determines the facts when it "plainly misapprehend[s] or misstate[s] the record in making [its] findings, and the misapprehension goes to a material factual issue that is central to petitioner's claim . . . ." *Byrd v. Workman*, 645 F.3d 1159, 1171–72 (10th Cir. 2011) (internal quotation marks and citation omitted). Paragraph 2254(e)(1) further instructs: "[A] determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1). And "[t]he

---

[9]The question whether all fair-minded jurists would agree is not a test, but an exercise in intuition, making analytical probity impossible. The inquiry is a way to bring a dispute to closure; it is not otherwise probative.

applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." *Id.*[10]

Overall, "Section 2254(d) reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Harrington v. Richter*, 562 U.S. 86, 102-103 (2011) (*quoting Jackson v. Virginia*, 443 U.S. 307, 332, n. 5 (1979) (Stevens, J., concurring in judgment)).

*De Novo Review*

When an applicant presents a claim that the state courts have not adjudicated on the merits, the federal court may review that claim *de novo*. *Johnson v. Williams*, 568 U.S. 289, 293, 303 (2013). Then, the "standard of review is more searching." *Stouffer v. Trammell*, 738 F.3d 1205, 1213 (10th Cir. 2013) (internal quotation marks and citation omitted). And courts "may exercise [their] independent judgment in deciding the claim." *McCracken v. Gibson*, 268 F.3d 970, 975 (10th Cir. 2001).

*Harmlessness*

Still, a writ of habeas corpus generally may not be granted unless the found constitutional error is also determined to have "'had substantial and injurious effect or influence in determining the jury's verdict.'" *Fry v. Pliler*, 551 U.S. 112, 116, 121-22 (2007) (*quoting Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993)). With respect to claims under *Strickland v. Washington*,

---

[10]The Supreme Court has "not yet 'defined the precise relationship between § 2254(d)(2) and § 2254(e)(1).'" *Brumfield v. Cain*, 135 S. Ct. 2269, 2282 (2015) (quoting *Burt v. Titlow,* 571 U.S. 12, 15 (2013)). Defining that relationship or the distinction between the two is not essential for my analysis here.

466 U.S. 668 (1984), however, if prejudice is found, additional review for prejudice under

*Brecht* is unnecessary. *Byrd*, 645 F.3d at 1167 n.9.

      With these standards in mind, I turn to Mr. Krutsinger's claims for habeas corpus relief.

### III. Discussion

***Claim One:  The Trial Court's Erroneous Preclusion of Testimony from the Complaining Witness's Former Counselor Violated Mr. Krutsinger's Sixth Amendment Rights to Present a Defense, to Compulsory Process, and to a Fair Trial.***

      Mr. Krutsinger's first claim based on the exclusion of Dr. Howard's testimony implicates

interrelated constitutional rights. The U.S. Constitution "guarantees a fair trial through the Due

Process Clauses [of the Fifth and Fourteenth Amendments], but it defines the basic elements of a

fair trial largely through the several provisions of the Sixth Amendment . . . ." *Strickland*, 466

U.S. at 684-85. Specifically, the Due Process Clause of the Fourteenth Amendment prohibits

states from depriving "any person of life, liberty, or property, without due process of law." U.S.

Const. Amend. XIV, § 1. And the Sixth Amendment affords the accused in all criminal

prosecutions the right "to be confronted with the witnesses against him" and "to have

compulsory process for obtaining witnesses in his favor," among other rights.  U.S. Const.

Amend. VI. Recognizing the overlapping nature of these provisions, the Supreme Court has

emphasized that: "Whether rooted directly in the Due Process Clause of the Fourteenth

Amendment, or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment,

the Constitution guarantees criminal defendants a meaningful opportunity to present a complete

defense." *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (internal quotation marks and citations

omitted).

**A. Application of § 2254(d)**

Mr. Krutsinger argues that the Colorado Supreme Court's ruling "that the exclusion of Dr. Howard's testimony did not violate [his] federal constitutional rights is contrary to federal law as clearly established by *Crane v. Kentucky*."[11]  Am. Pet. at 21. I agree that the standard articulated by the Colorado Supreme Court is contrary to clearly established federal law but do not undertake to apply the appropriate standard, because I find that any constitutional error is harmless under the test set out in *Brecht*. For a habeas court to grant relief after finding that a trial error violated a defendant's constitutional rights, the court still must determine that the error had "'substantial and injurious effect or influence in determining the jury's verdict.'" *Coddington v. Sharp*, 959 F.3d 947, 954-55 (10th Cir. 2020) (quoting *Brecht*, 507 U.S. at 637). While I determine that, under that standard, the error here was harmless, I believe the analysis would not be complete without additional discussion of the constitutional rights implicated.

On cross-examination, defense counsel attempted to impeach S.M. with her prior inconsistent statement to Dr. Howard regarding the timing of when the alleged sexual abuse by Mr. Krutsinger had supposedly ended:

Q: And you think it went on until the fourth grade?

A: Well, I have always said from second until sixth grade.

Q: You didn't tell Dr. Howard you think it went on until the fourth grade?

A: I don't think I did. I've always said from second until sixth grade.

Q: Well, Dr. Howard is going to come in.

. . .

---

[11]Mr. Krutsinger also asserts that the Colorado Supreme Court's ruling involves an unreasonable application of federal law and that it is based on an unreasonable determination of the facts. Because I find that any constitutional error is harmless, I do not address those other contentions.

> Q: Let me show you Dr. Howard's notes. "Think it went on until the fourth grade." You didn't tell her that?
>
> A: Well, that's what I've always said to everyone, that it's gone on from second to sixth grade. I don't remember ever telling anyone else anything else.
>
> Q: So Dr. Howard must be wrong?
>
> A: I don't know.

08/20/2003 Trial Tr. 63:21–64:14. During both that cross-examination of S.M. and his opening statement, defense counsel informed the jury that Dr. Howard would be testifying. *Id.* 64:4; 8/19/2003 Trial Tr. 38:10-13. But, as previously explained, the trial court excluded Dr. Howard's testimony on the basis that it was protected by the psychotherapist-patient privilege.

With his direct appeal, Mr. Krutsinger asserted that his constitutional rights were violated by the exclusion of Dr. Howard's testimony. The Colorado Court of Appeals remanded for the trial court to:

> (1) allow [Dr.] Howard to testify regarding the conversations she had with the victim during the counseling sessions, (2) determine, in light of this evidence, whether the exclusion of [Dr.] Howard's testimony was an error of constitutional dimension, and (3) if the error was not of constitutional dimension, determine whether the error was harmless under the ordinary harmless error standard.

*Krutsinger I*, 121 P.3d at 321-22. The Court of Appeals explained that the exclusion of evidence constitutes an "error of constitutional dimension" when the evidence is "material and favorable to defendant's case," and the court defined "materiality" as "mean[ing] the evidence would have affected the outcome of the trial." *Id.* at 322-23. In crafting this standard, the Court of Appeals relied heavily on the Tenth Circuit's analysis in *Richmond v. Embry*, 122 F.3d 886 (10th Cir. 1997).[12]

---

[12]In *Washington v. Texas*, the Supreme Court held that the petitioner's constitutional right to compulsory process was violated because the State arbitrarily prohibited him from calling a witness "whose testimony would have been relevant and *material* to the defense." 388 U.S. at 23 (emphasis added). That phrasing has led some courts to import and incorporate into their test for

On remand from the Colorado Court of Appeals, the trial court held the necessary hearing. Dr. Howard's testimony from that hearing is summarized above. Based on her testimony and the Court of Appeals' guidance, the trial court determined that the excluded evidence was not "material" and, therefore, that the error was not one of constitutional dimension. First Order on Remand at 4. As a result, the court applied the ordinary harmless error standard and concluded that the exclusion of Dr. Howard's testimony was harmless. *Id.* at 5. Mr. Krutsinger appealed that ruling, and the Colorado Court of Appeals affirmed the trial court, employing the same standards. *Krutsinger II* at 8-12.

The Colorado Supreme Court granted certiorari to review "the court of appeals' imposition of a materiality requirement as a prerequisite to classification of the trial court's error as federal constitutional error, as well as its ultimate determination that the exclusion of Dr. Howard's proffered testimony was harmless." *Krutsinger III*, 219 P.3d at 1057-58. In its opinion, the court correctly determined that the materiality requirement adopted by the Court of Appeals from *Richmond* is not properly applied to the exclusion of Dr. Howard's testimony. *Id.* at 1061.[13] It held:

---

violations of the right to present a defense the materiality standard from the progeny of *Brady v. Maryland*, 373 U.S. 83, 87 (1963). *See* Janet C. Hoeffel, *The Sixth Amendment's Lost Clause: Unearthing Compulsory Process*, 2002 Wis. L. Rev. 1275, 1353-54 (2002). In *Richmond*, for instance, a divided panel of the Tenth Circuit held that, for a defendant to establish that the trial court's exclusion of evidence violated his right to present witness testimony, the court must find that the excluded testimony was material, meaning that "it was of such an exculpatory nature that its exclusion affected the trial's outcome." 122 F.3d at 872.

[13]The majority in *Richmond* commented:

> [W]e are faced here with a compulsory process, rather than a confrontation clause challenge. In such a context, the Supreme Court has dictated a "materiality," or outcome-driven, test. Therefore, we are compelled to apply it. *Compare* [*Delaware v.*] *Van Arsdall*, 475 U.S. [673,] 680 [(1986)] ("[T]he focus of the confrontation clause is on individual witnesses") with [*United States v.*] *Valenzuela–Bernal*, 458 U.S. [858,] 867–68 [(1982)] ("[In] the area of constitutionally guaranteed access to evidence, we find [the] materiality requirement more than borne out . . . . [I]mplicit in the requirement of materiality is a concern that the suppressed evidence might

The court of appeals therefore erred in requiring a finding of constitutional materiality as a prerequisite to treating the trial court's evidentiary error as federal constitutional error. Rather than presuming that the exclusion of defense impeachment evidence could rise to the level of federal constitutional error only if its admission would have, considering the trial as a whole, created a reasonable doubt, the court of appeals should have inquired whether the trial court's evidentiary ruling, in and of itself, deprived the defendant of any meaningful opportunity to present a complete defense.

*Id.*

Referencing *Crane v. Kentucky* and *Delaware v. Van Arsdall*, 475 U.S. 673 (1986), the Colorado Supreme Court then concluded that the exclusion of Dr. Howard's testimony "did not rise to the level of federal constitutional error," since Mr. Krutsinger "was not prohibited from demonstrating motive or bias on the part of [S.M.] or from exposing to the jury virtually any additional facts from which they could draw inferences relating to her reliability." *Id.* at 1062-63. Summarizing the standard it was applying, the court stated: "[W]hile we have previously characterized a defendant's right to call witnesses in his own defense as a constitutional right, we have found an abridgment of that right only where the defendant was denied virtually his only means of effectively testing significant prosecution evidence." *Id.* at 1062-63. The court went on to hold that, although the trial court's ruling was erroneous under state evidentiary rules, it was harmless under the state's harmless-error standard. *Id.* at 1064.

The legal standard applied by the Colorado Supreme Court in determining whether Mr. Krutsinger's constitutional rights were violated by the exclusion of Dr. Howard's testimony is contrary to clearly established federal law as determined by the Supreme Court of the United States. In *Crane*, the U.S. Supreme Court made clear that "the Constitution guarantees criminal

---

have affected the outcome of the trial.'" ([q]uoting *United States v. Agurs*, 427 U.S. 97, 104 [](1976))). 122 F.3d at 872 n.5. In this case, the Confrontation Clause is implicated and "access to evidence" is not.

defendants a meaningful opportunity to present a complete defense." 476 U.S. at 690. Before that

pronouncement, the Court had stressed in *Chambers v. Mississippi* that "[f]ew rights are more

fundamental than that of an accused to present witnesses in his own defense." 410 U.S. 284, 302

(1973). And, in *Washington v. Texas*, the Court had explained:

> The right to offer the testimony of witnesses, and to compel their attendance, if
> necessary, is in plain terms the right to present a defense . . . . Just as an accused
> has the right to confront the prosecution's witnesses for the purpose of challenging
> their testimony, he has the right to present his own witnesses to establish a defense.
> This right is a fundamental element of due process of law.

388 U.S. 14, 19 (1967). At the same time, the Supreme Court reminded that, "the accused, as is

required of the State, must comply with established rules of procedure and evidence designed to

assure both fairness and reliability in the ascertainment of guilt and innocence." *Chambers*, 410

U.S. at 302. The Court emphasized that it "ha[d] never questioned the power of States to exclude

evidence through the application of evidentiary rules that themselves serve the interests of

fairness and reliability . . . ." *Crane*, 476 U.S. at 690.

In *Holmes v. South Carolina*, the Court elaborated on this balance. It clarified that, while

"[s]tate and federal rulemakers have broad latitude under the Constitution to establish rules

excluding evidence from criminal trials," 547 U.S. 319, 324 (2006) (quoting *United States v.

Scheffer*, 523 U.S. 303, 308 (1998)), "the Constitution . . . prohibits the exclusion of defense

evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that

they are asserted to promote." *Id.* at 326. *Holmes* reviews the Court's prior cases illustrating

"'arbitrary rules', i.e., rules that excluded important defense evidence but that did not serve any

legitimate interests." 547 U.S. at 325. This review includes:

— *Washington*, in which the defendant was precluded by a state statute from calling as a witness an alleged accomplice who had been charged in committing the same murder, *id.*; *Washington*, 388 U.S. at 15, 23;

— *Chambers*, in which the defendant was prevented by state evidentiary rules from impeaching a witness he called who had previously confessed to the murder with which he was charged, *Holmes*, 547 U.S. at 325-26; *Chambers*, 410 U.S. at 302-03; and

— *Crane*, in which the defendant was prohibited from showing at trial that his confession was unreliable due to a state procedure that deemed a trial court's pretrial voluntariness determination conclusive such that it could not be relitigated at trial, *Holmes*, 547 U.S. at 326; *Crane*, 476 U.S. 686-87.[14]

In *Holmes*, the defendant was not permitted to present evidence of another man's guilt due to the State's rule that evidence of a third-party's guilt may be excluded where there is strong evidence of the defendant's guilt. The Supreme Court held that rule applied by the State Supreme Court was arbitrary because it did not rationally serve the purpose that third-party guilt rules were designed to further, namely "to focus the trial on the central issues by excluding evidence that has only a very weak logical connection to the central issues." 547 U.S. at 330-31.

From this Supreme Court precedent, it was well established at the time of the Colorado Supreme Court's opinion in this case that, at a minimum, the arbitrariness of any restriction on a

---

[14]Moreover, in both *Chambers* and *Crane*, the U.S. Supreme Court highlighted the fact that the states had not put forward any argument justifying the applied rules. *Chambers*, 410 U.S. at 297 (stating that "Mississippi ha[d] not sought to defend the rule or explain its underlying rationale"); *Crane*, 476 U.S. at 691 (observing that "neither the Supreme Court of Kentucky in its opinion, nor respondent in its argument to th[e] Court, ha[d] advanced any rational justification for the wholesale exclusion of this body of potentially exculpatory evidence").

defendant's opportunity to present a *complete* defense should be considered in determining whether constitutional error occurred. *See Holmes*, 547 U.S. at 326 ("[T]he Constitution . . . prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote."). The standard laid out and applied by the Colorado Supreme Court fails to take into account whether any justification existed for the exclusion of the evidence, and so it is contrary to clearly established federal law.[15]

Respondents cite *Nevada v. Jackson*, 569 U.S. 505 (2013), to validate the standard formulated and applied by the Colorado Supreme Court. However, the U.S. Supreme Court found in *Jackson* that the constitutional propriety of the state evidentiary rule in question could not "be seriously disputed" and that there were "good reasons" supporting the rule. *Id.* at 509-10 (internal quotation marks, citations, and brackets omitted). The Court explained: "The admission of extrinsic evidence of specific instances of a witness' conduct to impeach the witness' credibility may confuse the jury, unfairly embarrass the victim, surprise the prosecution, and unduly prolong the trial. No decision of this Court clearly establishes that the exclusion of such evidence *for such reasons* in a particular case violates the Constitution." *Id.* at 511 (emphasis added). But no determination was made by the state courts here that Dr. Howard's testimony should be excluded for any of those reasons or based on any other valid evidentiary rule.

The Colorado Supreme Court's opinion also misconstrues the holdings of the relevant cases. Quoting *Crane*, the court stated: "[T]he standard or test for assessing whether a defendant's right to confront or present a defense has been violated by evidentiary rulings is

---

[15]The Colorado Court of Appeals' first order in this case states that it had "already concluded that the trial court erroneously excluded defendant's proffered evidence, and therefore, [it] need not consider the first criterion set forth in *Richmond*"—whether "the importance of the evidence to the defense outweighed the interests of the state in excluding the evidence." *Krutsinger I*, 121 P.3d at 322. The Colorado Supreme Court made no reference to this consideration, though.

clearly dependent upon the extent to which he was permitted to subject the prosecutor's case to 'meaningful adversarial testing.'" *Krutsinger III*, 219 P.3d at 1062 (quoting *Crane*, 476 U.S. at 691). The court then explained that, although it had "previously characterized a defendant's right to call witnesses in his own defense as a constitutional right, [it had] found an abridgment of that right only where the defendant was denied virtually his only means of effectively testing significant prosecution evidence." *Id.* While the court correctly looks to *Crane* for the applicable standard, its product is misconstructed. The full quote from *Crane* reads:

> [The] opportunity [to be heard] would be an empty one if the State were permitted to exclude competent, reliable evidence bearing on the credibility of a confession when such evidence is central to the defendant's claim of innocence. In the absence of any valid state justification, exclusion of this kind of exculpatory evidence deprives a defendant of the basic right to have the prosecutor's case encounter and "survive the crucible of meaningful adversarial testing."

476 U.S. at 690-91 (quoting *United States v. Cronic*, 466 U.S. 648, 656 (1984)). The Colorado Supreme Court flips the analysis and reasons that, if significant prosecution evidence was subject to meaningful adversarial testing in *any* way, the defendant could not have been denied his right to a meaningful opportunity to present a complete defense. Protecting a defendant's opportunity to present "competent, reliable evidence . . . central to [his] claim of innocence," *Crane*, 476 U.S. at 690, is not the same as shielding "virtually his only means of effectively testing significant prosecution evidence," *Krutsinger*, 219 P.3d at 1062-63.[16]

---

[16]Notably, the court cites *Golob v. People*, 180 P.3d 1006, 1013 (Colo. 2008), as an example of it finding an "abridgment of [a defendant's right to call witnesses in his own defense] only where the defendant was denied virtually his only means of effectively testing significant prosecution evidence." *Krutsinger III*, 219 P.3d at 1062. But the referenced language of the *Golob* opinion is part of its discussion of whether the constitutional error found was harmless, not part of its analysis of whether the defendant's constitutional rights were violated. *See Golob*, 180 P.3d at 1013-14. This lends support to Mr. Krutsinger's argument that the court "conflate[d] the prejudice inquiry with the threshold question of whether a federal constitutional violation occurred." Am. Pet. at 24.

The Colorado Supreme Court mischaracterizes the holding in *Van Arsdall* as well, stating:

> In *Van Arsdall*, the [U.S. Supreme] Court concluded that the defendant had successfully stated a violation of the Confrontation Clause only because the trial court prohibited "*all* inquiry" into the possibility of prosecution bias by a witness who placed the defendant at the scene, near the time of the murder, and because a "reasonable jury might have received a significantly different impression of [that witness's] credibility." 475 U.S. at 679–80, 106 S.Ct. 1431.

*Krutsinger III*, 219 P.3d at 1062–63. *Van Arsdall* does not hold that a violation of the defendant's constitutional right to be confronted with witnesses against him occurred "only because the trial court prohibited '*all* inquiry' into the possibility of prosecution bias by a witness." *Id.* at 1062. Instead, the Court in *Van Arsdall* explicitly declared: "We think that a criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby 'to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness.'" *Van Arsdall*, 475 U.S. at 680 (quoting *Davis v. Alaska*, 415 U.S. 308, 318 (1974)).

Even though I determine the standard articulated and applied by the Colorado Supreme Court is contrary to clearly established federal law, I find that the court's analysis of the harmlessness of the trial court's error is sound. Under the *Brecht* standard, I reach the same result as the Colorado Supreme Court.[17] Consequently, I assume, but do not find, that Mr. Krutsinger's constitutional rights were violated and proceed to evaluate whether the trial court's error was harmless.

---

[17]The Colorado Supreme Court's determination that no constitutional error occurred led it to apply the State's ordinary harmless-error standard, which the court recognized is nearly identical to the standard used in *Brecht*. *Krutsinger III*, 219 P.3d at 1063-64. As a result, Mr. Krutsinger's claim was never reviewed under the less forgiving harmlessness standard for constitutional error.

**B. Harmlessness under *Brecht***

Under *Brecht*, habeas relief may not be granted unless the trial error is determined to have "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 631.[18] So I must ask myself: "Do I . . . think that the error substantially influenced the jury's decision?" *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995). If, upon consideration of that question, I resolve that the "record is so evenly balanced that [I] am in grave doubt as to the harmlessness of the error," I must grant relief. *Id.* at 437, 442.

Mr. Krutsinger insists Dr. Howard's testimony was vital to his defense because it would have enabled his counsel to:

- Effectively impeach S.M. with her statement to Dr. Howard that the alleged sexual abuse lasted until she was in the fourth grade—not the sixth grade;

- Present evidence undermining S.M.'s excuse for not definitively naming Mr. Krutsinger as the perpetrator sooner; and

- Maintain his credibility by fulfilling his promise to the jury that Dr. Howard would testify.

Reply at 6-7.

By the time Dr. Howard testified at the hearing on remand she had no independent recollection of her sessions with S.M. and depended fully on the notes she had from two of the sessions. While the content of those notes is certainly relevant, the subjects were touched on by the defense in other ways. As all agree, the case came down to whether the jury believed S.M.

---

[18]*Brecht* left open "the possibility that in an unusual case, a deliberate and especially egregious error of the trial type, or one that is combined with a pattern of prosecutorial misconduct, might so infect the integrity of the proceeding as to warrant the grant of habeas relief, even if it did not substantially influence the jury's verdict." 507 U.S. at 638 n.9. That exception is not applicable to the error in this case.

Dr. Howard's testimony could not have tipped the scale such that S.M.'s testimony was incredible to the jury. Dr. Howard's notes would have only pointed to minor or repeated inconsistencies in S.M.'s account of the events, when defense counsel had already exposed major ones.

> As the Colorado Supreme Court reasoned:

> The defendant was permitted to, and did, thoroughly expose the witness's possible motive or bias, her prior inconsistent statements, various reasons why her ability to perceive or recollect the key events may have been limited, and the extent to which her recollection of events was disputed by others with a reason to know.

*Krutsinger III*, 219 P.3d at 1063–64; *see also id.* at 1062-63 (observing that "defense counsel was not restricted from challenging [S.M.]'s credibility by drawing the jury's attention to numerous inconsistencies between her testimony and either her various pretrial statements or the contradictory testimony of other witnesses; her failure to make outcry sooner, despite being surrounded by adults whom she admittedly trusted and respected; and her dislike for, and potential motives for lying about, her stepfather"). The defense showed that S.M. had made conflicting statements regarding the abuse, including about how the abuse first occurred, what Mr. Krutsinger wore during the abuse, how often it occurred, the circumstances of the last incident of abuse, whether he ejaculated, and whether he made any noises during it. The defense highlighted numerous other inconsistencies in S.M.'s story, such as whether she told Ms. Slabach and Mr. Lantz about the abuse previously, and it emphasized recent lies she had told, from ones about not turning in school assignments to forging checks.[19]

---

[19]Furthermore, S.M.'s testimony regarding what she told Dr. Howard about when the abuse ended does not directly conflict with Dr. Howard's notes. S.M. testified that she did not remember telling Dr. Howard that the abuse ended in fourth grade, as Dr. Howard's notes document, and that she did not know if Dr. Howard was wrong or incorrect. 08/20/2003 Trial Tr. 63:21–64:14. The notes and S.M.'s testimony are not inconsistent; they are in equipoise. Not remembering her prior statements may reflect on S.M.'s credibility, but Dr. Howard's notes would not impeach S.M. with a prior inconsistent statement.

The defense also presented evidence from which it could be inferred that S.M. was attempting to cover for the fact that she was originally unsure that Mr. Krutsinger was the perpetrator. Through the testimony of Mr. Lantz, defense counsel was able to cast doubt on S.M.'s excuse for not telling him before and for not definitively stating to Dr. Howard at their first session that Mr. Krutsinger was the perpetrator.

I am not persuaded by Mr. Krutsinger's insistence that, because Dr. Howard did not testify, the jury must have assumed that her testimony would not have been favorable to him. I agree with the trial court that defense counsel's references to Dr. Howard testifying were general, and the jury may have overlooked them or thought any number of reasons existed for her not testifying (e.g., that her testimony would have been repetitive or there were scheduling conflicts).

Considering the entire record and the adorning role Dr. Howard's testimony would have played, I cannot find that the trial court's error had "substantial and injurious effect or influence in determining the jury's verdict." Mr. Krutsinger's first claim for relief must, therefore, be denied.

### Claim 2: Mr. Krutsinger's Federal Constitutional Rights to Due Process and a Fair Trial Were Violated by Prosecutorial Misconduct During Closing Argument When the Prosecutor Misrepresented a Key Fact to Incorrectly Imply That Mr. Krutsinger Had Lied During His Testimony and Improperly Bolstered S.M.'s Credibility by Suggesting She Would Be Consigned to Hell if She Had Fabricated Her Allegations of Sexual Abuse.

Mr. Krutsinger's second and third claims for relief involve the prosecutor's imprudent statements during closing argument. Mr. Krutsinger's second claim relates to the statements he challenged and the Colorado Court of Appeals adjudicated on direct appeal, while his third claim concerns statements that the Court of Appeals declined to address during postconviction proceedings. Taken together, the prosecutor's statements indicate that he was more concerned

with rhetorical flourishes than justice. Had I presided over the trial, I likely would have stepped in. However, that is not the standard for my review of the claims here. On Mr. Krutsinger's second claim, I am charged with evaluating whether the state courts' adjudication was contrary to or involved an unreasonable application of the law, and I cannot conclude that it did. On his third claim, I assume independent review is authorized and still find the prosecutor's statements were not so damaging as to justify granting habeas relief.

## A. Prosecutorial-Misconduct Standard

Mr. Krutsinger alleges that the prosecutor's misconduct violated his federal constitutional rights to due process and a fair trial. In *Berger v. United States*, 295 U.S. 78, 89 (1935), the U.S. Supreme Court held that the defendant was entitled to a new trial due to the "pronounced and persistent" misconduct of the prosecuting attorney. Later, in *Darden v. Wainwright* the Court announced that the relevant question in assessing prosecutorial misconduct "is whether the prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). The analysis for answering that question "proceeds in two steps: (1) [the court] decide[s] whether the prosecutor's comments were improper, and (2) if they were, [the court] examine[s] the likely effect of the comments on the jury's verdict." *United States v. Currie*, 911 F.3d 1047, 1055 (10th Cir. 2018) (citation omitted). In making such a determination, the court must consider the comments in context and take "notice of all the surrounding circumstances, including the strength of the state's case." *Hamilton v. Mullin*, 436 F.3d 1181, 1187 (10th Cir. 2006) (internal quotation marks and citations omitted). "[I]t is not enough that the prosecutor's remarks were undesirable or even universally condemned." *Darden*, 477 U.S. at 181 (quotation

omitted). Inappropriate or improper comments do not necessarily render the trial unfair. *See Trice v. Ward*, 196 F.3d 1151, 1167 (10th Cir.1999).

Furthermore, "considerable latitude is given to the prosecutor in closing argument in replying to an argument raised by defense counsel's closing statement." *Currie*, 911 F.3d at 1056 (internal quotation marks, brackets, and citations omitted). "And courts 'should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning.'" *Currie*, 911 F.3d at 1056 (quoting *Donnelly*, 416 U.S. at 647).

## B. Application of § 2254(d)

In his second claim, Mr. Krutsinger seeks relief based on two statements made by the prosecutor during closing argument:  one implying that Mr. Krutsinger lied on the stand about having met with Mr. Lantz, and the other making vaguely religious references. Since the state courts adjudicated these allegations of prosecutorial misconduct, I must apply the deferential review standard prescribed in § 2254(d). Under that standard, Mr. Krutsinger makes the conclusory assertion that the Court of Appeals' disposition of his claim was "contrary to, and an unreasonable application of, clearly established federal law as set forth by the U.S. Supreme Court as established in *Berger*." Am. Pet. at 28.

### 1. Implication that Mr. Krutsinger Lied Regarding Meeting with Mr. Lantz

Mr. Krutsinger contends the prosecutor committed misconduct by implying that he lied during his trial testimony about having met with Mr. Lantz. The prosecutor, in his closing rebuttal, stated:

> He says, Why in the world would he go to Mr. Lantz? Why would he go to Mr. Lantz and get all of the information about suicide and then E-mail the folks about,

> you know, wanting to [be informed of any] signs of suicide? Why in the world
> would he do that? Is there any evidence of that besides what the defendant said?
> Did you notice that Mr. Lantz sat right on that witness stand and no one asked him
> about whether the defendant came to see him? Think to yourself why that might be.

8/22/2003 Trial Tr. 57:25-58:8. This was in response to defense counsel's closing argument, in

which defense counsel argued that Mr. Krutsinger had encouraged the victim to see the school

counselor:

> [Mr. Krutsinger] goes to see Mr. Lantz [the school counselor] and says, . . . could
> you please see her? Imagine if you're sexually assaulting someone asking for them
> to go see the counselors, asking for teachers to keep an eye on them. The name of
> the game is isolation. And, of course, there is none of that here.

*Id.* 46:23-47:3. Defense counsel then argued to the jury:  "[T]his case is about who do you

believe, for one person must be lying and one person must be telling the truth. There is no

intermediate step." *Id.* 53:15-17.

The Colorado Court of Appeals viewed the prosecutor's comment regarding Mr. Lantz as

improperly suggesting that Mr. Krutsinger may not have met with the counselor at all, when the

counselor's testimony at the preliminary hearing substantiated that he had. *Krutsinger I*, 121 P.3d

at 325. Nevertheless, the court held that reversal was unwarranted. It acknowledged that

"[c]laims of improper argument must be evaluated in the context of the argument as a whole and

in light of the evidence before the jury," and it concluded that, "in the context of the entire

argument and in light of the other evidence before the jury," the comment was "not so flagrantly,

glaringly, or tremendously improper as to warrant reversal." *Id.* at 324. This assessment is not

contrary to and does not involve an unreasonable application of federal law. Mr. Krutsinger's

assertion stating otherwise is unsupported.

In *Berger*, the Supreme Court found that the prosecutor made not only improper

suggestions and insinuations, but also assertions of personal knowledge that were "pronounced

and persistent, with a probable cumulative effect upon the jury which cannot be disregarded as inconsequential." 295 U.S. at 89. And the prosecutor's misconduct was not limited to his closing argument. Specifically, the prosecutor in *Berger* was:

> guilty of misstating the facts in his cross-examination of witnesses; of putting into the mouths of such witnesses things which they had not said; of suggesting by his questions that statements had been made to him personally out of court, in respect of which no proof was offered; of pretending to understand that a witness had said something which he had not said and persistently cross-examining the witness upon that basis; of assuming prejudicial facts not in evidence; of bullying and arguing with witnesses; and, in general, of conducting himself in a thoroughly indecorous and improper manner.

*Id.* at 84. Here, although the prosecutor's comment regarding Mr. Krutsinger's conversation with the counselor was improper, neither that statement nor his conduct as a whole could be said to be "materially indistinguishable" from the misconduct in *Berger*.[20] Thus, the Court of Appeals did not confront "facts that are materially indistinguishable from a relevant Supreme Court precedent and arrive[] at a result opposite to [the Supreme Court's]." *Williams*, 529 U.S. at 405 (O'Connor, J., concurring in the judgment of the Court and delivering the opinion of the Court as to Part II). Nor can it be concluded that *all* fair-minded jurists would find, contrary to the Court of Appeal's decision, that the prosecutor's statements rose to the level of misconduct in *Berger*. *See Wood*, 907 F.3d at 1289.

---

[20]The Court of Appeals' determination that reversal was not warranted is also supported by the instructions given to the jury clarifying that argument from the parties was not evidence. Before closing arguments, the judge informed the jury that they were "at the juncture now where evidence has been concluded and the parties are to submit closing arguments to you." 8/22/2003 Trial Tr. 5:3-5. The jury instructions further stated: "The evidence in this case consists of the sworn testimony of all the witnesses and all exhibits which have been received in evidence. You are to consider only the evidence in this case and reasonable inferences therefrom." Jury Instruction #9, ECF No. 33. There is no reason to believe that the jury disobeyed these instructions and improperly considered closing arguments as evidence. *See Currie*, 911 F.3d at 1061 ("We presume the jury follows its instructions in the absence of an overwhelming probability to the contrary.") (quoting *United States v. Dahda*, 853 F.3d 1101, 1117 (10th Cir. 2017)).

### 2. Reference to a "Diabolical" Plot and the "Pit of Hell"

Mr. Krutsinger also challenges the prosecutor's statements in closing that referred to a "diabolical, despicable plot" and "the pit of hell." The prosecutor proclaimed:

> If this girl is lying to you, think about what a lie this is. This isn't just some cute little lie. Either this girl has told you the truth, opened her heart up to you and told you what happened to her when she was a little girl, or this is the most diabolical, despicable plot from the pit of hell to accuse a man of something like this if he didn't do it. She knows the consequences of that. Is she really that girl? Is she that evil girl?

8/22/2003 Trial Tr. 56:11-19.

Mr. Krutsinger argues that the prosecution "improperly injected religious beliefs into the jury's deliberations by suggesting that S.M. would be consigned to hell if its verdict did not support the government's version of events." Am. Petition at 36. The Court of Appeals found that even if the prosecutor's response to defense counsel's closing argument was not reasonable, the "religion-based argument is too tenuous to warrant reversal." *Krutsinger I*, 121 P.3d at 325.[21] The court reasoned that "the terms 'pit of hell' and 'diabolical' appear to have been rhetorical flourishes, rather than an invocation of the victim's religious beliefs." *Id.*

Courts have held that similar rhetoric did not so infect the trial with unfairness as to warrant reversal of a conviction. For example, in *Romero v. Franklin*, 244 F. App'x 224, 226-27 (10th Cir. 2007), the Tenth Circuit upheld the district court's ruling that the prosecutor did not improperly appeal to societal alarm by stating, during closing arguments, that methamphetamine

---

[21]In his Reply in Support of his Amended Petition, Mr. Krutsinger argues that "Respondents fail to refute that the [Court of Appeals'] factual determination that the terms 'diabolical' and 'pit of hell' 'had nothing to do with religious belief' was unreasonable because it ignores the biblical origin and clear religious nature of those concepts." Reply at 9. But this argument was not set out in his Amended Petition. Nowhere in the Court of Appeals' opinion does the court state that the terms "had nothing to do with religious belief." The court merely found that Mr. Krutsinger's claim was too tenuous to warrant reversal. *See Krutsinger I*, 121 P.3d at 325. The court's decision is not based on any unreasonable factual determination.

was a "plague on the streets of Duncan, Oklahoma," and by referring to defendant's use of "a child to do this plague."

Mr. Krutsinger cites the Sixth Circuit case *Coe v. Bell*, 161 F.3d 320, 351 (6th Cir. 1998), for the proposition that a prosecutor's reference to the Bible and scripture during closing argument is improper, yet he ignores the fact that the Sixth Circuit found the statements inappropriate but nevertheless concluded that they had not "so tainted the proceedings that they constitute[d] reversible error." *Id.* Further, while courts have found reversible error where the prosecutor argued to the jury that the Bible commanded capital punishment for the defendant, *see Sandoval v. Calderon*, 241 F.3d 765, 780 (9th Cir. 2000), that is a far cry from the comments made by the prosecutor here.

Mr. Krutsinger's assertion that the prosecutor "insinuated that if the jury rejected the veracity of S.M.'s testimony by acquitting Mr. Krutsinger, then S.M.'s soul would be consigned to eternal hell," Reply at 15, is not the most obvious or sensical interpretation of the prosecutor's comments. Indeed, the prosecutor said nothing to assign any particular religious beliefs to the victim or any religious ramifications of the jury verdict. As the Court of Appeals concluded, his statements can reasonably be interpreted as rhetorical flourishes intended to demonstrate the seriousness of lying about sexual abuse.

Moreover, when prosecutorial remarks are made in response to defense counsel's comments, "the [c]ourt must consider the probable effect the prosecutor's response would have on the jury's ability to judge the evidence fairly. In this context, defense counsel's conduct, as well as the nature of the prosecutor's response, is relevant." *United States v. Young*, 470 U.S. 1, 12 (1985) (internal citations omitted). Here, the Court of Appeals considered the arguments as a whole and concluded that the prosecutor's comments responded to defense counsel's attacks on

39

the victim's credibility. *Krutsinger I*, 121 P.3d at 324. The court also noted that "where the case turns on which witness the jury believes, each side is entitled to argue that its witnesses testified truthfully while the witnesses for the opposing side testified falsely." *Id.* (citing *People v. Salter*, 717 P.2d 976 (Colo. App. 1985)).

Because the legal standard set out by the Supreme Court in *Darden* and its progeny is general, state courts have "more leeway . . . in reaching outcomes in case-by-case determinations." *Parker v. Matthews*, 567 U.S. 37, 48 (2012) (internal quotation marks and citations omitted). Mr. Krutsinger has not established that the Court of Appeals' decision "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded [sic] disagreement." *Id.* at 47 (internal quotations marks and citation omitted). Thus, I conclude that the court's denial of relief was not contrary to or an unreasonable application of federal law, and so I deny Mr. Krutsinger's second claim.

### Claim 3: Cumulative Instances of Prosecutorial Misconduct During Closing Arguments Violated Mr. Krutsinger's Federal Constitutional Rights to Due Process, the Presumption of Innocence, and a Fair Trial.

Mr. Krutsinger's third claim asserts that his constitutional rights to due process, the presumption of innocence, and a fair trial were violated as a result of additional statements by the prosecutor during closing arguments. He contends that the prosecutor committed misconduct by (1) characterizing the school counselor's testimony as reflecting a belief that the victim's outcry was "truthful"; (2) responding to defense counsel's "listen for the lie" theme by saying Mr. Krutsinger's not-guilty plea was the real "lie" in the case; and (3) referencing the sex-assault expert's testimony as describing the incidence of incest non-reporting as "98 percent." This

alleged misconduct was not directly addressed by the state courts.[22] "[T]he deferential § 2254(d) standard does *not* apply to issues not decided on the merits by the state court." *Grant v. Royal*, 886 F.3d 874, 889 (10th Cir. 2018) (internal quotation marks, citations, and brackets omitted). So I may apply a "more searching" standard to Mr. Krutsinger's third claim, *see Stouffer*, 738 F.3d at 1213, and may exercise "independent judgment in deciding [it]," *McCracken*, 268 F.3d at 975. Still, "any state-court findings of fact that bear upon the claim are entitled to a presumption of correctness rebuttable only by clear and convincing evidence." *Grant*, 886 F.3d at 889 (internal quotation marks, citations, and brackets omitted).

## A. Independent Review

*1. Statements Characterizing the School Counselor's Testimony*

First, I consider Mr. Krutsinger's argument regarding the prosecutor's characterization of the school counselor's testimony. Mr. Lantz testified that during S.M.'s "outcry," it was "like her defenses had come down and she was allowing me to see what she was feeling." 8/20/2003 Trial Tr. 193:20-21. In closing, the prosecutor argued:

> And then what did [Mr. Lantz] say about this outcry? He said this was different. This is different than anything I have seen from her. It was like a breakthrough. He

---

[22]Respondents argue that the prosecutorial misconduct asserted in Mr. Krutsinger's third claim is procedurally defaulted, while Mr. Krutsinger maintains that his arguments were properly exhausted in state court. Mr. Krutsinger raised these claims to the Court of Appeals for the first time during his postconviction proceedings, and the court refused to consider his "refined and expanded argument that he was denied due process as a result of multiple instances of prosecutorial misconduct during closing argument." *Krutsinger IV* at 28-29. Mr. Krutsinger states that even if his third claim has been procedurally defaulted, I should still review the claim on the merits because he can establish cause and prejudice excusing the procedural default. *See* Reply at 14. I need not decide whether the claims are defaulted because "[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(2); *see also Patton v. Mullin*, 425 F.3d 788, 810 (10th Cir. 2005). And I conclude that these claims fail on the merits.

said it was like she let her defenses down and finally I got to see her pain. This is a guy who deals with kids all the time, a professional school counselor. Before that he worked for many years on the psychiatric ward with troubled teens. His impression was this was different. This was truthful.

8/22/2003 Trial Tr. 22:16-24.

Although the Court of Appeals did not evaluate the merits of Mr. Krutsinger's argument as a part of his prosecutorial-misconduct claim, it did evaluate the prosecutor's statement under his ineffective-assistance claim. *See Krutsinger V* at 12-15. The Court of Appeals concluded that the statement, in context, was not improper. *Id.* at 14-15. It reasoned:

> The school counselor had described the victim as having progressed from stoic and unable to trust him with information to being emotional and letting her guard down. This implied that the victim believed she was telling the counselor something important, and thus truthful. And as the jury was well aware, this case boiled down to the victim's and [Mr.] Krutsinger's credibility. Also, the prosecutor had argued this apparent change in the victim's demeanor to rebut defense counsel's numerous accusations that she was lying. *See People v. Rojas*, 181 P.3d 1216, 1223 (Colo. App. 2008) ("[I]n assessing a claim of improper argument, a reviewing court must take into account 'defense counsel's opening salvo.'" (quoting *People v. Vialpando*, 804 P.2d 219, 225 (Colo. App. 1990))). So, the prosecutor's comment "was not an expression of personal opinion but, rather, was part of the prosecutor's summary of evidence that supported an inference that [the victim] was telling the truth." *Id.* at 1224.

*Id.* The Court of Appeals further explained that although the counselor had not testified that he had worked on a "psychiatric ward with troubled teens," the prosecutor's statement was supported by record evidence because "[t]he school counselor testified at trial that he had previously worked in a children's hospital, and 80% of the patients were there because of sexual problems." *Id.* at 13. I find this reasoning to be persuasive. The prosecutor's characterization of Mr. Lantz's testimony was not unfounded and surely did not "infect[] the trial with unfairness as to make the resulting conviction a denial of due process." *Darden*, 477 U.S. at 181 (internal quotation marks and citation omitted).

*2. Characterizing Not-Guilty Plea as a "Lie"*

Mr. Krutsinger's next allegation of misconduct involves the prosecutor's insinuation that his not-guilty plea was a "lie." In his rebuttal closing, the prosecutor argued:

> [S.M.'s account is] not a lie, ladies and gentlemen, it's the truth. [Defense] [c]ounsel encouraged you to listen for the lie. That was his opening statement. Listen for the lie in this case. And I am going to change it a little. I'm going to ask you to look for the lie, and I'm going to tell you where you find it. You look at the last sentence of Jury Instruction No. 2 where it says the defendant pleaded not guilty. That's the lie. He's guilty. Find him guilty.

08/22/2003 Trial Tr. 60:17-25.

As with the prosecutor's summary of Mr. Lantz's testimony, the Court of Appeals considered these statements in the context of Mr. Krutsinger's ineffective-assistance claim, and it concluded "that to the extent the prosecutor's statement addressed the victim's credibility, it wasn't improper in this context." *Krutsinger V* at 15. The court reasoned that "[t]he prosecutor made this comment in response to defense counsel's closing arguments that the victim had repeatedly lied to numerous people about many things." *Id.* at 16.

The Court of Appeals did "not condone" the prosecutor's statement. *Id.* at 17 n.1. Nevertheless, it concluded that "'the likelihood that [jurors] were improperly affected by the prosecutor's choice of language, under the circumstances of this case, was negligible.'" *Id.* (quoting *Crider v. People*, 186 P.3d 39, 43 (Colo. 2008)). The court noted that "[t]he prosecutor's statement was one isolated comment" and "was in rebuttal to defense counsel's theory and repeated arguments that either the victim or [Mr.] Krutsinger was lying." *Id.* at 17.

I agree with the Court of Appeals' logic. Obviously, prosecutors should refrain from unnecessarily commenting on a defendant's exercise of his constitutional rights. Here, however, the prosecutor explicitly linked his statement to defense counsel's "listen for the lie" theme, and "considerable latitude is given to the prosecutor in closing argument in replying to an argument

raised by defense counsel's closing statement." *Currie*, 911 F.3d at 1056 (internal citation and brackets omitted). The statement was not so inappropriate as to render the trial unfair, however benumbed and obtuse it might be.[23]

### 3. Misstatement of Testimony Regarding the Frequency of Incest Reporting

In his closing, the prosecutor referred to the testimony of Ms. McNally, who discussed her organization's sex assault education program in Colorado schools, *see* 8/21/2003 Trial Tr. 61:2-62:14, 68:12-18. The prosecutor stated, "What does she say about the program? She said the reason we have the program is because no one tells about this. 98 percent of incest victims never tell anybody. . . . What did Ms. McNally tell you about incest victims? Most of them . . . were 30 years old [when they reported the abuse]." 8/22/2003 Trial Tr. 55:6-9, 55:22-24. However, Ms. McNally did not actually testify that "98 percent of incest victims never tell anybody." Rather, she said that "after doing adult survivor groups for many, many, many years, I am sure I can count[] easily on two hands the number of people who actually reported their abuse when it happened," 8/21/2003 Trial Tr. 54:14-25. And she explained that "the average age that people get help is in their early 30s for childhood sexual abuse." *Id.* 55:13-15.

Again, the Court of Appeals reviewed these statements in the context of Mr. Krutsinger's ineffective-assistance claim. It concluded as follows:

> Though the prosecutor inaccurately said that "98% of incest victims never tell anybody," such statement, although not directly quoting the expert's testimony, wasn't materially or prejudicially different from the expert's phrasing that she could "count . . . on two hands the number of people who actually reported their abuse

---

[23]The jury was instructed that "[e]very person charged with a crime is presumed innocent," and that "[t]his presumption of innocence remains with the defendant throughout the trial and should be given effect by you unless, after considering all of the evidence, you are then convinced that the defendant is guilty beyond a reasonable doubt." Jury Instruction #5, ECF No. 33. It cannot be assumed that the jury disregarded that instruction because of the prosecutor's vertiginous statement.

> when it happened" out of the thousand or more incest victims she had worked with. *See also People v. McBride*, 228 P.3d 216, 221 (Colo. App. 2009) (giving prosecutors the benefit of the doubt for ambiguous or inartful arguments because arguments "delivered in the heat of trial are not always perfectly scripted"). So, because the difference in the wording between the prosecutor's phrase and the expert's was immaterial, we perceive no prejudice to [Mr.] Krutsinger caused by defense counsel's decision to not object.

*Krutsinger V* at 12. I find the Court of Appeals' analysis to be rational. Although the prosecutor's restatement of Ms. McNally's testimony was inartful, the prosecutor was merely making the point that most child incest victims significantly delay reporting the abuse. I will not assume that the prosecutor intentionally misstated or misrepresented Ms. McNally's testimony. Indeed, "all closing arguments of counsel[] are seldom carefully constructed in toto before the event; improvisation frequently results in syntax left imperfect and meaning less than crystal clear." *Donnelly*, 416 U.S. at 646-47. "[A] court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations." *Id.* at 647. Thus, I find that the prosecutor's statements regarding Ms. McNally's testimony were not improper and that they did not render Mr. Krutsinger's trial unfair.

I consider all aspects of the prosecutorial misconduct alleged by Mr. Krutsinger in both the direct appeal and postconviction proceedings. The prosecutor undeniably teetered on the line of impropriety. But the only indefensible and truly improper statement made by the prosecutor was his implication that Mr. Krutsinger did not meet with Mr. Lantz, a claim that he should have known was undermined by the evidence. That being the case, I find any cumulative prosecutorial misconduct or prejudice did not "'so infect[] the trial with unfairness as to make the resulting conviction a denial of due

process.'" *Darden*, 477 U.S. at 181. Consequently, Mr. Krutsinger is not entitled to habeas relief on his second or third claims.

### Claim 4: Mr. Krutsinger's Trial Attorney Provided Ineffective Assistance of Counsel Under the Sixth and Fourteenth Amendments.

Mr. Krutsinger's final claim asserts that his trial attorney provided him with ineffective assistance such that his Sixth Amendment right to counsel was violated. Of Mr. Krutsinger's four claims for habeas relief, this claim has given me the greatest challenge. First, the circumstances of the case have prompted me to reexamine the often-applied ineffective-assistance-of-counsel standard set forth in *Strickland v. Washington*. That fresh look has left me searching in vain for precision and consistency. Second, because Mr. Krutsinger's claim is before me on his petition for habeas relief, review of the state courts' decisions must be "highly deferential," and "doubly" so for ineffective-assistance claims like this one. *Harrington*, 562 U.S. at 105 (citations omitted). Thus, I must exercise restraint and set aside my independent opinion of his counsel's performance.

### A. Ineffective-Assistance-of-Counsel Standard

In addition to the rights described above, the Sixth Amendment guarantees criminal defendants the right to "the assistance of counsel for [their] defense." U.S. Const. Amend. VI. The Sixth Amendment's guarantee "entails that defendants are entitled to be represented by an attorney who meets at least a minimal standard of competence." *Hinton v. Alabama*, 571 U.S. 263, 272 (2014). As mentioned, the seminal U.S. Supreme Court case *Strickland v. Washington* sets forth the standard "by which to judge a contention that the Constitution requires that a criminal judgment be overturned because of the actual ineffective assistance of counsel." 466

U.S. at 684. That standard requires the defendant to make two showings:  (1) deficient

performance by his trial counsel and (2) prejudice. *Id.* at 687. "The benchmark for judging any

claim of ineffectiveness must be whether counsel's conduct so undermined the proper

functioning of the adversarial process that the trial cannot be relied on as having produced a just

result." *Strickland*, 466 U.S. at 686.


*Deficient Performance*

In order to establish that counsel's performance was deficient under *Strickland*, the

defendant must show that his counsel's conduct fell below an objective standard of

reasonableness for attorneys in criminal cases, resulting in errors "so serious that counsel was not

functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687-88.

When courts consider ineffective-assistance claims, the object "is not to grade counsel's

performance." *Id.* at 697. Instead, it is to "determine whether, in light of all the circumstances,

the identified acts or omissions were outside the wide range of professionally competent

assistance." *Id.* at 690.

The Court in *Strickland* instructed that scrutiny of counsel's performance must be "highly

deferential," explaining that:

> It is all too easy for a court, examining counsel's defense after it has proved
> unsuccessful, to conclude that a particular act or omission of counsel was
> unreasonable. A fair assessment of attorney performance requires that every effort
> be made to eliminate the distorting effects of hindsight, to reconstruct the
> circumstances of counsel's challenged conduct, and to evaluate the conduct from
> counsel's perspective at the time.

*Id.* at 689 (citation omitted). As a part of this deferential standard, *Strickland* obliges courts to

"indulge a strong presumption that counsel's conduct falls within the wide range of reasonable

professional assistance," meaning "the defendant must overcome the presumption that, under the

circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). The Court elaborated on this presumption, stating that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 691. Additionally, in describing why prevailing standards of practice should only be used as guides for what is reasonable, the *Strickland* Court commented that counsel must have "wide latitude" in making "tactical decisions." *Id.* at 689.

The Supreme Court has since clarified that, ultimately, the relevant question for determining whether an attorney's performance was deficient "is not whether counsel's choices were strategic, but whether they were reasonable." *Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000). Nevertheless, whether counsel's conduct could be considered "strategic" or "tactical" remains a central inquiry of the *Strickland* analysis.

In *Bullock v. Carver*, 297 F.3d 1036, 1046-51 (10th Cir. 2002), the Tenth Circuit examined the intersection of the strategy-related presumptions defendants must overcome under *Strickland* and the ultimate reasonableness determination. The court summarized its interpretation, stating:

> [W]hether a counsel's actions can be considered strategic plays an important role in our analysis of *Strickland's* deficient performance prong. As a general matter, we presume that an attorney performed in an objectively reasonable manner because his conduct might be considered part of a sound strategy. Moreover, where it is shown that a challenged action was, in fact, an adequately informed strategic choice, we heighten our presumption of objective reasonableness and presume that the attorney's decision is nearly unchallengeable.

*Id.* at 1051. This directive contributes some transparency. But, conspicuously, the term "strategic" is left undefined.

Courts and counsel frequently employ the terms "strategy" and "tactics" interchangeably without precision or consistency. In my experience, none take care to define them. From Supreme Court precedent, one can glean what conduct is not strategic, e.g., that resulting from inattention[24] or ignorance.[25] One can also gather examples of what could fall within the purview of strategy or tactics.[26] Still, the parameters of each are not clearly defined. What is meant by strategic and tactical decisions? Are they the same? And are they entitled to similar deference?[27]

Without answers to these questions, I fear that haphazard application of the *Strickland*

---

[24]*See, e.g.*, *Wiggins v. Smith*, 539 U.S. 510, 526 (2003) (concluding that counsel's failure to thoroughly investigate the defendant's background for a death penalty mitigation defense "resulted from inattention, not reasoned strategic judgment"); *Rompilla v. Beard*, 545 U.S. 374, 383-84 (2005) (determining counsel's performance was deficient because they did not examine the court file on the defendant's prior conviction when the prosecution used the defendant's criminal history as an aggravating factor in seeking the death penalty).

[25]*See, e.g.*, *Hinton*, 571 U.S. at 273-74 ("An attorney's ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance under Strickland."); *id.* (determining counsel's performance was deficient for failing "to seek additional funds to hire an expert where that failure was based not on any strategic choice but on a mistaken belief that available funding was capped at $1,000"); *Williams*, 529 U.S. at 395 (holding counsel's performance was deficient because they failed "to conduct an investigation that would have uncovered extensive records [for death penalty mitigation purposes], not because of any strategic calculation but because they incorrectly thought that state law barred access to such records"); *Kimmelman v. Morrison*, 477 U.S. 365, 385 (1986) (finding deficient counsel's failure to conduct pretrial discovery when that failure "was not based on 'strategy,' but on counsel's mistaken belie[f] that the State was obliged to take the initiative and turn over all of its inculpatory evidence to the defense").

[26]*See, e.g.*, *Strickland*, 466 U.S. at 699 (deferring to counsel's choice "to argue for the extreme emotional distress mitigating circumstance and to rely as fully as possible on respondent's acceptance of responsibility for his crimes" and "not to seek more character or psychological evidence than was already in hand"); *Yarborough v. Gentry*, 540 U.S. 1, 10 (2003) (finding counsel's decision to present a "low-key" closing argument in which he appeared "as the friend to jury autonomy" to be strategic).

[27]For example, a panel of the Tenth Circuit stated in *Moore v. Marr*, 254 F.3d 1235, 1239 (10th Cir. 2001), that "[s]trategic or tactical decisions on the part of counsel are presumed correct." The court provided no definition of either term and drew no distinction between the two. *Cf. Yarborough*, 540 U.S. at 5–6 ("[C]ounsel has wide latitude in deciding how best to represent a client, and deference to counsel's tactical decisions in his closing presentation is particularly important because of the broad range of legitimate defense strategy at that stage.").

test and conjecture by courts and counsel are inevitable.[28]  It is much like the celebrated

"Chancellor's foot" veto in that the outcome depends on who is interpreting what is strategic or

tactical. And it calls to mind a notorious critique of the use of the English language, one which I

aim not to exemplify:

> The writer either has a meaning and cannot express it, or he inadvertently says
> something else, or he is almost indifferent as to whether his words mean anything
> or not. This mixture of vagueness and sheer incompetence is the most marked
> characteristic of modern English prose, and especially of any kind of political
> writing. As soon as certain topics are raised, the concrete melts into the abstract and
> no one seems able to think of turns of speech that are not hackneyed: prose consists
> less and less of words chosen for the sake of their meaning, and more and more of
> phrases tacked together like the sections of a prefabricated hen-house.

George Orwell, *Politics and the English Language*, Horizon, Apr. 1946.

In an effort to clarify some of the opacity, I previously explored the specific meaning of

the term "strategy":

> In its simplest definition, strategy is a plan toward a goal. Webster's Third New
> International Dictionary, Unabridged 2256 (3d ed. 1981). In more detail, it is "a
> plan, or series of maneuvers or stratagems for obtaining a specific goal or result."
> Random House Unabridged Dictionary 1880 (2nd ed. 1993).

*United States v. Worku*, Case Nos. 17-cv-00497, 12-cr-00346, 2017 WL 4051755, *9 (D. Colo.

Sept. 11, 2017). Those definitions emphasize that any "strategy" employed by counsel must

relate directly to the final goal.

Adding to that study, the Barnhart Dictionary of Etymology defines strategy as a "clever

or careful plan." Robert K. Barnhart, The Barnhart Dictionary of Etymology 1074 (1988). The

word is borrowed from the French stratégie and from the Greek stratēgíā, meaning the "office or

---

[28]As observed in the Criminal Procedure treatise, "[c]ourts sometimes speak broadly of matters
of trial strategy and tactics simply not constituting grounds for a finding of ineffective assistance
of counsel. However, neither Strickland nor the lower court rulings go so far." 3 Wayne R.
LaFave, et al., *Crim. Proc.* § 11.10(c) (4th ed. 2019) (internal quotation marks, footnote, and
citations omitted).

command of a general." *Id.* As early as 1810, it was defined in English as the "art of planning

military movements and operations." *Id.* In comparison, the term tactics is defined in the

Barnhart Dictionary as "procedures to gain advantage." *Id.* at 1110. It is borrowed from the Latin

tactica, meaning "the art of deploying forces in war." *Id.* Looking deeper, one finds the Greek

taktikḕ téchnē—the "art of arrangement"—and taktikós—"of or pertaining to arrangement or

ordering, especially tactics in war." *Id.* As early as 1626, it was defined in English as the "art or

science of deploying military or naval forces in battle." *Id.* Considering these origins, the

distinction between strategy and tactics must be that strategy involves the overall plan, while

tactics pertain to the execution of the specific arrangements and procedures.[29]

These specifications fit the *Strickland* standard. As an art, advocacy requires first a

concept, then a strategy to implement the concept, and then techniques which are informed

tactical devices intended to realize the concept. In any legal case, as with any painting, sculpture,

musical composition, or literary work, there is initially an array of facts and a clear objective. A

strategy should be developed by culling the facts and determining what available resources can

be employed to achieve the objective. It stands to reason that a strategy must be preceded by

adequate investigation and capable of being articulated before witnesses are selected, motions

are filed, jury selection begins, and arguments and examination of witnesses occur in trial. In that

case, the strategy will be deemed reasonable unless it is completely aberrational. Likewise, the

tools and techniques employed should align with the strategy. When they do and are applied

---

[29] *See also* Lawrence Freedman, *Strategy: A History* X (2013) ("[S]trategy remains the best word
we have for expressing attempts to think about actions in advance, in light of our goals and our
capacities. It captures a process for which there are no obvious alternative words, although the
meaning has become diluted through promiscuous and often inappropriate use."); *id.* at XI
("[S]trategy is much more than a plan. A plan supposes a sequence of events that allows one to
move with confidence from one state of affairs to another. Strategy is required when others
might frustrate one's plans because they have different and possibly opposing interests and
concerns.")

properly, those tactics will be found to be reasonable as well.

This understanding of the terms strategic and tactical and how they influence the determination of whether counsel's conduct was reasonable provides the foundation for my discussion below of the Colorado Court of Appeals' conclusions regarding the performance of Mr. Krutsinger's trial attorney.

*Prejudice*

The second component of the ineffective-assistance-of-counsel standard requires a defendant to establish that counsel's deficient performance prejudiced the defense. That means "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is defined as "a probability sufficient to undermine confidence in the outcome." *Id.* Consequently, the focus of this prejudice inquiry is whether "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. In evaluating the impact of counsel's errors, I appreciate that "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Id.* at 696.

The two components of the *Strickland* standard—deficient performance and prejudice— may be addressed in any order, and both need not be addressed if there is a failure to make a sufficient showing of one. *Cooks v. Ward*, 165 F.3d 1283, 1292-93 (10th Cir. 1998) (citing *Strickland*, 466 U.S. at 697).

**B. Application of § 2254(d)**

As with his first and second claims, Mr. Krutsinger must show that the state court's adjudication of his ineffective-assistance claim resulted in a decision that was contrary to or involved an unreasonable application of clearly established federal law or that was based on an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d). My discussion of the *Strickland* standard above should make apparent that I would have taken a different approach than the state courts in analyzing Mr. Krutsinger's ineffective-assistance-of-counsel claim. It is also possible I would have reached a different result. But, under § 2254(d):

> The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland*'s standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different . . . A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

*Harrington*, 562 U.S. at 101. As a result, I "must determine what arguments or theories supported . . . the state court's decision; and then [I] must ask whether it is possible fairminded [sic] jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Id.* at 102.

As Respondents point out, much of Mr. Krutsinger's fourth claim argues that the Colorado Court of Appeals' decision is unreasonable simply because it does not conclude that Mr. Krutsinger received ineffective assistance of counsel. *See* Ans. at 54, ECF No. 32. The Supreme Court has made clear that § 2254(d) "demands more." *Harrington*, 562 U.S. at 102. Indeed, in *Harrington*, the Court commanded that "Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d)." *Id.* at 105. For "even a strong case for relief does not mean the state court's contrary conclusion

was unreasonable." *Id.* at 102.

Forty-three pages of Mr. Krutsinger's Amended Petition are dedicated to his ineffective-assistance-of-counsel claim, yet only three of those pages dig into the Court of Appeals' decisions. In those three pages, Mr. Krutsinger asserts that the Colorado Court of Appeals' decisions meet the requirements for granting relief under § 2254(d), because:

(1) The court conducted a "piecemeal analysis" of counsel's performance that is contrary to and/or an unreasonable application of *Strickland*;

(2) The court's holding that counsel's failure to investigate and present character witnesses was an unreasonable application of *Wiggins v. Smith* and *Sears v. Upton*, 561 U.S. 945 (2010);

(3) The court's holding that counsel "was reasonable in failing to investigate and present testimony that S.M. was dishonest was an unreasonable determination of fact and an unreasonable application of law";

(4) The court unreasonably applied the law in concluding that counsel's failure to introduce the email Mr. Krutsinger sent to S.M.'s teachers right before S.M. disclosed the abuse to Mr. Lantz was not deficient;

(5) The court's holding that counsel's cross-examination of Ms. McNally "was not outside the realm of constitutionally sufficient performance was an unreasonable determination of fact and an unreasonable application of *Strickland*, *Wiggins*, and *Sears*";

(6) The court unreasonably applied *Strickland* when it determined that counsel's failure to consult with and call a defense expert was not deficient performance;

(7) The court unreasonably applied *Strickland* in determining that it was a reasonable strategy for counsel to introduce evidence of "violent criminal acts allegedly committed by" Mr. Krutsinger;

(8) The court unreasonably applied *Strickland* and *Crawford v. Washington*, 541 U.S. 36 (2004), in holding that counsel's "failures to challenge the admissibility of extensive hearsay statements were either appropriate or non-prejudicial"; and

(9) The court unreasonably determined the facts and unreasonably applied *Strickland* in holding that counsel's "failure to object to pervasive prosecutorial misconduct was a reasonable strategic decision, was not deficient performance, and was not prejudicial."

Am. Pet. at 77-80. Most of these critiques consist of tautologies that fail to describe how the Court of Appeals' application of the law or its factual determinations are unreasonable.

Before I address each alleged error, though, I turn back to the first piece of the *Strickland* standard set out above and consider whether counsel's performance should be afforded the

presumption that it was reasonable because the alleged errors could have been part of a sound strategy. At the postconviction hearing, counsel testified that the strategy he formulated was to: (1) attack S.M.'s credibility by revealing inconsistencies in her allegations and (2) demonstrate that she had motives for falsely accusing Mr. Krutsinger, including that she was covering for her bad behavior, that she wanted to go live with her father in Washington State, and that she wanted to separate her mother from Mr. Krutsinger. 4/13/2012 Postconviction Hr'g Tr. 98:18-21, 101:1-4, 147:5-24, 148:13-17, 152:23-153:2, 184:24:187:14, 195:5-12. Specifically, he stated: "I believe that our theory of the case was that's why [S.M.] was saying these things, and so she and her mom, whether she thought she was rescuing her mom or whether she just wanted to leave, would be able to get away from Mr. Krutsinger and that that was the story that she could make up that would assure that to happen." *Id.* 147:17-24. Mr. Krutsinger asserts that this trial strategy is a *post hoc* rationalization of his trial attorney's conduct, but I am not persuaded.[30]

Additionally, Mr. Krutsinger argues that this overall strategy was unreasonable to the extent it caused counsel to permit the jury to hear that he had violent encounters with his wife. I address this latter argument below and determine that, considering all of the circumstances of the case,

---

[30]Mr. Krutsinger contends that his trial counsel engaged in *post hoc* rationalization by claiming that part of the defense theory was that S.M. lied to separate Mrs. Krutsinger from him. In support of that argument, Mr. Krutsinger points to the fact that counsel did not reference that motive in his opening statement and did not expressly argue it at any point. However, counsel testified that he did not focus on that argument during his opening statement because he did not know how and to what extent the evidence of the Krutsingers' arguments would be presented at trial. 4/13/2012 Postconviction Hr'g Tr. 186:16-187:1, 196:4-15. Moreover, he elicited testimony from Mr. Krutsinger that S.M. was present for the fights between the Krutsingers and that Mr. Krutsinger believed S.M. "made this story up to separate her mom and [him]." 8/21/2003 Trial Tr. 144:1-6, 152:21-22, 190:23-25. In closing, counsel followed up on that evidence, arguing:

> [T]his is a turbulent marriage. There is no question about that. These people are shouters, one and the other. And I am not cutting [Mr.] Krutsinger any slack. There is no reason for him to do that which occurred, this shouting and loud stuff. But he gave as good as he got . . . . No doubt that [S.M.] saw that and no doubt that that had an impact on how she thought of [Mr.] Krutsinger and her mother.

8/22/2003 Trial Tr. 42:5-15.

counsel's general trial strategy was not unreasonable.

From there, Mr. Krutsinger points to specific decisions made by counsel that he believes were not based on sufficient investigation or were the product of inattention. Because counsel formulated a reasonable trial strategy, the question is whether the particular errors alleged by Mr. Krutsinger result from properly applied tactics employed in support of counsel's overall strategy. This inquiry incorporates whether sufficient investigation was performed to know if the decisions would further the defense strategy and whether the decisions were made for some extraneous reason.

Such an inquiry is difficult in this case because it involves determining where the balance should lie between experience and preparation. There is no denying that counsel had extensive experience. *See id.* 75:7-76:3 (stating that he had tried between 200 and 300 cases and his practice consisted of 90% criminal work), 93:1-6 (confirming that he had testified approximately 25 times as an expert on effective assistance of counsel). But experience cannot always substitute for legwork. As Mr. Krutsinger's effective-assistance expert testified, trial counsel may have suffered from "hubris," believing his experience could carry him through. *See* 9/14/2012 Postconviction Hr'g Tr. 30:7, 33:13, ECF No. 33. Nevertheless, as detailed below, I find the Court of Appeals was not unreasonable in its assessment of counsel's performance.

### 1. Cumulative Analysis of Counsel's Deficient Performance and Prejudice to the Defense

Mr. Krutsinger's predominant argument is that the Court of Appeals failed to consider cumulatively all of his trial attorney's conduct in evaluating whether counsel's performance was deficient and whether it caused sufficient prejudice to warrant reversal. Although Mr. Krutsinger does not cite any case law specifically addressing how exactly a court is to evaluate cumulatively

counsel's performance, I agree in principle that an attorney's representation should be considered as a whole.[31]

In its first order on Mr. Krutsinger's Rule 35(c) Petition, the postconviction court included in its articulation of the ineffective-assistance-of-counsel standard:

> The relevant inquiry is whether counsel's *representation* fell below an objective standard of reasonableness as informed by prevailing professional standards and that the defendant was so prejudiced by the deficient performance of counsel that there was a reasonable probability that, but for counsel's unprofessional *errors*, the result of the proceeding would have been different.

3/29/13 Rule 35(c) Order at 2 (emphasis added). After conducting a thorough analysis of the issues, the court explained its conclusion based on that standard:

> [T]his Court does not sit as a 13th juror. The Court is only asked to determine if the defendant had effective representation during the trial. The defendant had a theory to present to the jury. This theory was based on the status of the evidence and the experience of trial counsel. It also appears to have been done in consultation with the defendant. Trials are not mathematical problems to be resolved with a degree of mathematical precision. That is borne out by the language that requires trial courts, when addressing allegations of ineffectiveness to "indulge a strong presumption that counsel's conduct falls with the wide range of reasonable assistance; that is, the defendant must overcome the presumption that, under the circumstances the challenged action might be considered sound trial strategy[.]" See *Strickland v. Washington*, *supra*, at 466 U.[S]. at 689, 104 S.Ct. at 2065, 80 L.Ed.2d at 694-695. Trial counsel exposed significant behavioral problems on the part of the victim along with numerous inconsistencies in her testimony at trial and prior statements to law enforcement and others. The defendant testified at trial and denied all of the allegations of the victim. The jury had the opportunity to view and assess the testimony of both the victim and the defendant. The jury returned guilty verdicts.
>
> Crim. P. 35(c) is not a vehicle to permit a defendant, after unsuccessfully pursuing a strategy at trial, to regroup and present another strategy to a different jury. The defendant has failed to establish that [his attorney]'s representation fell below an

---

[31] *See, e.g.*, *Stouffer*, 168 F.3d at 1163-64 (concluding "no one instance establishes deficient representation," but "cumulatively, each failure underscores a fundamental lack of formulation and direction in presenting a coherent defense"); *but see Ellis v. Raemisch*, 872 F.3d 1064, 1090 (10th Cir. 2017) ("[B]ecause we have discerned through the lens of AEDPA only one possible instance of deficient performance (i.e., error)[,] . . . we need not address [the defendant]'s argument for cumulative prejudice; there must be more than one error to conduct cumulative-error analysis.").

> objective standard of reasonableness as informed by prevailing professional
> standards with respect to *all* of defendant's claims. The defendant's Petition for
> Post[c]onviction Relief pursuant to Crim. P. 35(c) is DENIED.

*Id.* at 16 (emphasis added). Thus, the postconviction court clearly understood that its job was to assess counsel's complete performance. The Colorado Court of Appeals' first order on Mr. Krutsinger's ineffective-assistance-of-counsel claim reversed the postconviction court's order in part and remanded for further findings on two of the errors counsel was alleged to have committed. *Krutsinger IV* at 29. Those two errors were counsel's failure to challenge the admissibility of hearsay statements and to object to purported prosecutorial misconduct during closing argument. *Id.* at 7. The Court of Appeals affirmed "the balance" of the postconviction court's order. *Id.* On remand, the postconviction court prefaced its Order with the statement: "As part of any analysis the Court incorporates its prior orders and findings and the decisions []of the Colorado Court of Appeals and Supreme Court to specifically include the standards that apply in a postconviction challenge alleging ineffective assistance of counsel[.]" Rule 35(c) Order on Remand at 3. It then denied Mr. Krutsinger's Petition for Postconviction Review for a second time. *Id.* at 14. In its opinion affirming that decision, the Court of Appeals rearticulated the *Strickland* standard, including that it is counsel's "representation" that is evaluated for reasonableness and that "all the circumstances" must be considered in that determination. *Krutsinger V* at 5 (quoting *Strickland*, 466 U.S. at 688). The court went on to affirm the postconviction court's decision and state: "We have concluded, by applying the appropriate standard of review under *Strickland*, that defense counsel didn't provide ineffective assistance . . . ." *Id.* at 24. Considering this procedural posture and the state courts' decisions, it is clear the Court of Appeals considered the entire scope of his representation and all the attendant circumstances and did not just analyze counsel's conduct in isolated incidents.

Like the state courts, I take into account the full performance of Mr. Krutsinger's trial attorney but tackle the specific errors alleged as Mr. Krutsinger has presented them.

## 2. Decision Not to Investigate or Present the Testimony of Character Witnesses

Mr. Krutsinger's first criticism of his trial attorney is that he did not investigate or call as witnesses the numerous individuals who could have provided favorable testimony regarding Mr. Krutsinger's character. On that issue, the Court of Appeals wrote:

> At the postconviction hearing, fourteen witnesses testified that they knew [Mr.] Krutsinger and were of the view that he had good character, was a good person, and had they been asked, they would have testified accordingly at trial. [Mr. Krutsinger's trial attorney] testified about his decision not to call character witnesses. He explained that although [Mr.] Krutsinger had given him a list of potential character witnesses, he decided not to present such evidence because it would allow the prosecution an opportunity to sum up its case during the cross-examination of each witness. Specifically, he stated:
>
> > [The prosecution] could say, Mr. Character Witness, did you know that [the victim] said this? Does that make it sound like your character trait? Did you know [the victim] said that?
> >
> > And I was worried that an experienced prosecutor would be able in cross-examination to ask those questions enough time[s] of character witnesses that . . . the character witnesses would have to say no, no, no, and I believe that whatever benefit we got from character witnesses was not worth that exposure.
>
> [Mr. Krutsinger's expert on the standards for effective assistance of counsel] disagreed with this decision and opined that the character witnesses 'were very good witnesses' who had 'very good things to say about Mr. Krutsinger.' And he 'didn't think that they were really impeachable at all.'
>
> [Mr. Krutsinger's trial attorney and his effective-assistance expert] presented different views on whether character witnesses should have been presented. It was for the postconviction court to weigh the competing testimony. *See People v. Curren*, 228 P.3d 253, 258 (Colo. App. 2009). The postconviction court found that "the decision to call or not call character witnesses is a strategy decision within the hands of counsel." It further acknowledged [trial counsel's] rationale for not calling the witnesses and found that he was not ineffective in failing to interview or call the character witnesses.

> The record supports the postconviction court's findings. [Mr. Krutsinger's trial attorney] explained his concerns with presenting character testimony and, specifically, that he believed the risks outweighed the possible benefits of such testimony. We cannot conclude that his concerns about cross-examination were unreasonable. *See, e.g., Burger v. Kemp*, 483 U.S. 776, 792-95 (1987) (concluding that failure to introduce character evidence in capital sentencing hearing was not ineffective because witnesses could have been subjected to harmful cross-examination or invited other damaging evidence); *see also Davis* [*v. People*], 871 P.2d [769,] 773 [(Colo. 1994)] ("[A]n attorney's decision not to interview certain witnesses and to rely on other sources of information, if made in the exercise of reasonable professional judgment, does not amount to ineffective assistance.").
>
> We thus agree with the postconviction court that [counsel]'s decision to not present character witnesses did not fall outside the wide range of professionally competent representation, particularly in light of [counsel]'s extensive criminal defense experience. E.g., *Williams v. Head*, 185 F.3d 1223, 1228 (11th Cir. 1999) ("Our strong reluctance to second guess strategic decisions is even greater where those decisions were made by experienced criminal defense counsel.") (citation omitted).

*Krutsinger IV* at 7-10.

Mr. Krutsinger contends that the Court of Appeals' analysis involves an unreasonable application of the Supreme Court's holdings in *Wiggins* and *Sears* because it ignores the undisputed fact that trial counsel "failed to *investigate* the good-character witnesses before deciding not to call them." Am. Pet. at 78. I am not persuaded.

The Court of Appeals' citation to *Burger v. Kemp* confirms that it directly considered counsel's limited investigation. The two issues raised by the habeas petitioner and addressed by the Supreme Court in *Burger* were whether the petitioner was denied the effective assistance of counsel because his lawyer (1) "labored under a conflict of interest" and (2) "failed to make an adequate investigation of the possibly mitigating circumstances of his offense." 483 U.S. at 777. The relevant analysis here relates to the second contention—that counsel failed to make an adequate investigation. Applying the *Strickland* standard, the Court in *Burger* concluded that "counsel's decision not to mount an all-out investigation into petitioner's background in search

of mitigating circumstances was supported by reasonable professional judgment." *Id.* at 794. The same could be said here.

> *Strickland* explained that:
>
> [C]ounsel has a duty to make reasonable investigations *or to make a reasonable decision that makes particular investigations unnecessary*. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

466 U.S. at 690-91 (emphasis added). And, "when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether." *Id.*

Here, Mr. Krutsinger provided his trial attorney with 23-pages of biographical information and notes relevant to his case, including the names of many potential "character witnesses," their backgrounds, and their experience with him. *See* Postconviction Hr'g Exs. F & G, ECF No. 33. From these documents, counsel could assume that the individuals listed would provide the best possible testimony regarding Mr. Krutsinger's character.[32] Counsel testified that he was reluctant, however, to call character witnesses in such a case because they provided an experienced prosecutor with the opportunity to repeatedly restate the prosecution's case. *See* 4/13/2012 Postconviction Hr'g Tr. 165:22-166:15.[33] At the postconviction hearing, the

---

[32]Counsel testified that he did speak with some of these potential witnesses but did not prepare any for trial. 4/13/2012 Postconviction Hr'g Tr. 164:11-15.

[33]Mr. Krutsinger argues that counsel's fear is based on a misunderstanding of the law as prosecutors are not permitted to ask questions with guilt-assuming hypotheticals. There is no indication that counsel misunderstood the relevant law. While it is true that guilt-assuming hypotheticals are not allowed in cross-examining witnesses testifying to a defendant's reputation, *United States v. Polsinelli*, 649 F.2d 793, 795-797 (10th Cir. 1992), "have you heard" questions are generally permitted in cross-examining character witnesses about their opinions, *see S.E.C. v. Peters*, 978 F.2d 1162, 1169-70 (10th Cir. 1992); *United States v. Parker*, 553 F.3d 1309, 1320 (10th Cir. 2009) (in a criminal case in which the defendant was charged with a scheme to sell deficient airplane engines, finding appropriate the question—would it "change your opinion of [the defendant] if you found out he had been selling aircraft engines through Trade–A–Plane that

prosecution demonstrated that the testimony of many of the witnesses could be discounted by their admission that they were not privy to Mr. Krutsinger's sexual preferences or what happened behind closed doors in his home. 6/15/2012 Postconviction Hr'g Tr. 105:11-14, 109:13-21, 124:19-22, 157:2-9, 175:15-21, 182:7-9. The prosecutor also stressed that the trial court likely would have limited much of the character evidence for its cumulative nature. *See* 4/13/2012 Postconviction Hr'g Tr. 188:22-189-9. Considering the defense strategy to focus on inconsistencies in S.M.'s story and motives for her to lie, counsel's tactical decision regarding investigation of the character witnesses was not unreasonable. *See Strickland*, 466 U.S. at 691 (instructing that when counsel has "reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable"). Moreover, it was within counsel's discretion to decide that character-witnesses testimony would not advance the defense strategy enough to justify the exposure it could bring. *See United States v. Miller*, 643 F.2d 713, 714 (10th Cir. 1981) ("Whether to call a particular witness is a tactical decision and, thus, a 'matter of discretion' for trial counsel." (quoting *United States v. Dingle*, 546 F.2d 1378, 1385 (10th Cir. 1976))).

The Court of Appeals' decision concluding the same is not contrary to and does not involve an unreasonable application of the Supreme Court's holdings in *Wiggins* and *Sears*. Both cases involved inadequate investigation by counsel in the penalty phase of a capital case. In *Wiggins*, counsel failed to conduct even a basic investigation into the defendant's "dysfunctional background," deciding to concentrate on their theory that the defendant was not directly responsible for the crime instead of possible mitigation evidence. 539 U.S. at 517-18. Finding that counsel did not comply with standard practice in investigating a capital defendant's

---

were unairworthy"?). Such questions would have given the prosecutor the opportunity to restate the facts of the case against Mr. Krutsinger, as feared by counsel.

background and that the evidence known to counsel would have led a reasonable attorney to investigate further, the Court held that counsel's performance was deficient. *Id.* at 534. In reaching its conclusion, the Court clarified the standard to be applied when inadequate investigation is claimed, stating: "In light of these standards, our principal concern in deciding whether [counsel] exercised 'reasonable professional judgmen[t]," is not whether counsel should have presented a mitigation case. Rather, we focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence of [the defendant's] background *was itself reasonable*." *Id.* at 523. As explained above, the Court of Appeals' decision in Mr. Krutsinger's case considers the investigation performed by his trial attorney. The limited investigation by Mr. Krutsinger's counsel is distinguishable from that performed in *Wiggins* in that counsel in this case had reason to believe the presentation of character evidence could have been counterproductive and he did not violate any set professional standards. *See id.* at 525, 534. Mr. Krutsinger cites *Sears* for its discussion of the application of the prejudice prong of the *Strickland* standard in an inadequate investigation claim. But the Court of Appeals' decision here did not reach the prejudice prong.

As such, I cannot find that all fair-minded jurists would disagree with the Court of Appeals' conclusion that counsel's tactical decisions related to Mr. Krutsinger's character witnesses were not unreasonable.

*3. Decision Not to Investigate and Present General Evidence that S.M. Was Dishonest*

Next, Mr. Krutsinger challenges his trial attorney's decision not to investigate and present general witness testimony that S.M. was dishonest. On that issue, the Court of Appeals stated:

> At the postconviction hearing, [Mr.] Krutsinger presented a witness who testified that he knew the victim, and in his opinion she is untruthful. He confirmed that, if

asked, he would have so testified at [Mr.] Krutsinger's trial. [Mr.] Krutsinger contends that [his trial attorney] was constitutionally deficient because he did not interview or present this witness at trial. We disagree.

[Mr. Krutsinger's attorney] testified that "the theme of this case was that [the victim] is a liar." In support of this theme, he stated that he sought to attack the victim's character for truthfulness by impeaching her during cross-examination and directly exposing inconsistencies and lies in that manner. Explaining his decision, [counsel] said that he believed it is more beneficial to have specific instances of the victim's lies than to present a general reputation witness.

A review of the trial transcript confirms that [counsel] did in fact directly challenge the victim's credibility. In that regard, [counsel] drew the

> jury's attention to numerous inconsistencies between [the victim's] testimony and either her various pretrial statements or the contradictory testimony of other witnesses; her failure to make outcry sooner, despite being surrounded by adults whom she admittedly trusted and respected; and her dislike for, and potential motives for lying about, her stepfather.

*Krutsinger III*, 219 P.3d at 1062.

[Counsel]'s decision to directly attack the victim's truthfulness through cross-examination was a reasonable trial strategy. *See Davis*, 871 P.2d at 773 (decision regarding what witnesses to present is a matter of trial strategy); *see also Hinojos-Mendoza v. People*, 169 P.3d 662, 669 (Colo. 2007) (decisions regarding whether and how to conduct cross-examination are committed to counsel). We thus agree with the postconviction court that the fact that [counsel] did not present a witness to opine that the victim was not truthful did not fall below an objective standard of reasonableness.

*Krutsinger IV* at 10-11.

Mr. Krutsinger contends that the Court of Appeals' holding that it was reasonable for counsel not to investigate and present this testimony is based on an unreasonable determination of fact and involves an unreasonable application of law. In his Reply in Support of his Amendment Petition, Mr. Krutsinger asserts that, "since the witness in question was not called as a 'general reputation' witness but instead for *opinion* testimony," the Court of Appeals unreasonably determined that counsel acted pursuant to a reasonable trial strategy. Reply at 24.

Without elaboration from Mr. Krutsinger, I presume that this argument stems from the mention of the word "reputation" by counsel in his postconviction testimony and by the Court of Appeals in its opinion. This criticism is without merit. Although the Court of Appeals' heading for its discussion quoted above reads "Reputation Witness," its analysis recognizes that the significance of Mr. Crain's testimony was his "opinion" that S.M. is untruthful. *Krutsinger IV* at 10. Moreover, trial counsel's use of the term "reputation" was in response to a question by the prosecutor regarding the use of a "general reputation witness." 4/13/2012 Postconviction Hr'g Tr. 190:14-21. It is evident all players involved understood the nature of the testimony in question, such that the Court of Appeals' decision is not based on an unreasonable determination of fact.

Likewise, the decision does not involve an unreasonable application of law. As I have stated, I agree with Mr. Krutsinger that challenging S.M.'s credibility was key in his case. But it was within counsel's discretion to make reasonable tactical decisions on how best to further that strategy. Here, counsel believed, based on his experience, that specific instances of S.M.'s inconsistent statements and dishonesty would carry more weight with the jury than a witness's general opinion that she was untruthful. He successfully pointed to the many inconsistencies in S.M.'s account of the abuse and called out her lies to her mother, her teachers, and Mr. Krutsinger. As a result, all fair-minded jurists would not disagree with the Court of Appeals' conclusion that counsel's strategy and performance was reasonable in this regard.

*4. Decision Not to Offer Specific Email into Evidence*

Mr. Krutsinger further faults his trial counsel for not seeking to admit into evidence at trial an email he sent to S.M.'s teachers an hour and a half before she disclosed the abuse to Mr. Lantz. The Court of Appeals' consideration of this matter reads as follows:

> [Mr.] Krutsinger sent an e-mail to the victim's teachers expressing concerns about the victim's grades and assignments a few hours before the victim's outcry to her high school counselor. [Mr.] Krutsinger contends that [his trial attorney] provided ineffective assistance of counsel because he did not introduce the e-mail at trial or link the particular e-mail to the timing of the outcry to the victim's counselor. We do not agree.
>
> [Counsel] testified that he could not specifically remember why he did not introduce the e-mail, but he believed "there was significant testimony concerning the e-mails" and that [Mr.] Krutsinger, the victim, and the victim's mother all testified about various, similar e-mails.
>
> The postconviction court agreed, noting that evidence was presented that [Mr.] Krutsinger e-mailed the victim's teachers, to her dismay. And the supreme court likewise observed that during trial the victim was "forced to concede her dislike for her stepfather and particularly what she considered to be his interference in her affairs by communicating with her teachers, which effectively exposed lies she had told about certain school assignments." *Krutsinger III*, 219 P.3d at 1056.
>
> Through witness testimony, [Mr. Krutsinger's trial attorney] presented evidence of the communications between [Mr.] Krutsinger and the victim's teachers, and the victim's reaction to such communications. The manner in which to present particular evidence is a matter of trial strategy. *E.g., Steward v. People*, 179 Colo. 31, 34, 498 P.2d 933, 934 (1972) ("Defense counsel stands as captain of the ship in ascertaining what evidence should be offered . . . ."). That [counsel] did not present duplicative evidence does not render him constitutionally deficient. *See [People v.] Washington*, [2014 COA 41,] ¶ 35 (counsel not constitutionally ineffective in failing to present evidence that would have been cumulative of the testimony of other witnesses).
>
> We accordingly agree with the postconviction court that [counsel] was not constitutionally deficient because he did not separately introduce [Mr.] Krutsinger's e-mail.

*Krutsinger IV* at 12.

Mr. Krutsinger accuses the Court of Appeals of unreasonably applying the law here. He

asserts that the court's "reasoning erroneously ignores that [the] closeness in time of this email to S.M.'s outcry at school renders the content of the email relevant, admissible, and strong circumstantial evidence of fabrication." Am. Pet. at 86. The email does not have the value Mr. Krutsinger confers on it, though. There is no indication in the record that S.M. was even aware of the email before her disclosure to Mr. Lantz. And, before the email was sent, S.M. had already shared the details of the abuse with her mother, including her certainty that Mr. Krutsinger was the perpetrator.

Counsel elicited testimony on Mr. Krutsinger's communication with S.M.'s teachers from at least three witnesses. 8/20/2003 Trial Tr. 44:24-45:19 (S.M.); *id.* 153:7-17 (Mrs. Krutsinger); 8/21/2003 Trial Tr. 162:22-165:2, 185:22-186:1 (Mr. Krutsinger). Since counsel did not remember precisely why he did not seek to have the email admitted, it would be a leap to conclude that he made a tactical decision regarding it. Nevertheless, as the Court of Appeals concluded, his omission of the email was not constitutionally deficient when there was other evidence of the communications and the email was of questionable value.

### 5 & 6. Decision Not to Seek Information from the Prosecution's Expert Pretrial and Decision Not to Consult or Call an Expert to Rebut the Prosecution's Expert

Mr. Krutsinger also takes issue with his trial attorney's handling of the prosecution's expert witness. He insists that counsel's decisions not to seek additional information before the trial on Ms. McNally's testimony and not to consult with a defense expert or call one as a witness were unreasonable. In addressing the adequacy of counsel's pretrial investigation and cross-examination of Ms. McNally, the Court of Appeals stated:

> When asked about his preparation for cross-examining the prosecution's expert witness, [Mr. Krutsinger's trial attorney] testified that he was familiar both with the specific expert to be presented as well as the type of testimony to be presented. He

elaborated that he had crossexamined [sic] this expert within the previous year as well as experts offering similar testimony. In describing the type of generalized testimony the expert would offer, he testified:

> I knew what she was going to testify to. I had seen her before. She had not seen [the victim]. She had not read the discovery. She was just going to give generalized information. My belief is that generalized information was not very persuasive.
>
> Second, it was our theory of cross-examination that because [the expert] was biased and was a serious person against sex abuse, that there was no way that she would ever say anything was inconsistent with a sex abuser's reported tale.

He also explained that during cross-examination, he was able to get the expert to agree that many different kinds of victim behavior would be consistent with sexual abuse, and thus essentially nothing would be inconsistent with sexual abuse.

[Mr. Krutsinger's effective-assistance expert] opined that [counsel]'s conduct was "deficient and below the standard of care." Specifically, [the effective-assistance expert] testified that [counsel] should have investigated [Ms. McNally]'s qualifications and opinions, interviewed her before trial, and consulted a defense expert.

The postconviction court found that during [counsel]'s cross-examination, he was able to get the expert to admit that (1) she believed everyone who came in to her office to report abuse; and (2) reporting incest/sexual abuse in stages, reporting it at one time, immediate reporting, and delayed reporting were all consistent with being a sexual abuse victim. While in [the effective-assistance expert's] opinion that was not constitutionally adequate, it was for the postconviction court to weigh the competing testimony. *E.g.,* [*People v.* ]*Curren*, 228 P.3d [253,] 258 [(Colo. App. 2009)]. And disagreements on trial strategy will not support a claim of ineffectiveness. *Davis*, 871 P.2d at 773.

The record supports the postconviction court's finding that [Mr.] Krutsinger did not establish that "[his trial attorney]'s handling and cross-examination of the [prosecution's] expert witness was outside the wide range of reasonable professional assistance." Perhaps [counsel] could have gotten the expert to make an additional concession; perhaps not. That the cross-examination was not perfect does not make counsel's cross-examination strategy deficient. *Strickland* does not guarantee flawless representation. *Harrington v. Richter*, 562 U.S. 86, 111 (2011). And the right to competent counsel is not a guarantee against mistakes of strategy or the exercise of judgment. *Dolan v. People*, 168 Colo. 19, 22-23, 449 P.2d 828, 830 (1969).

*Krutsinger IV* at 14-16.

Mr. Krutsinger again argues that the Court of Appeals unreasonably applied *Strickland*, *Wiggins*, and *Sears*. Additionally, citing *Wood v. Allen*, 558 U.S. at 304, he asserts that the court's "determination that [counsel]'s lack of preparation was trial strategy is an unreasonable determination of fact." Am. Pet. at 86. According to Mr. Krutsinger, his trial counsel was deficient in failing to: (1) request a summary of Ms. McNally's expected testimony, (2) request the bases and reasons for her testimony, (3) interview her pretrial, (4) obtain transcripts of her prior testimony, (5) investigate her and her biases, and (6) consult with a defense expert to help him prepare for cross-examining her. Mr. Krutsinger asserts that, had his counsel done these things, counsel could have gotten Ms. McNally to make a number of concessions, including that false allegations do occur and that some reasons for them might be mental health issues, secondary gain, or to cover up other problems. 6/15/2012 Postconviction Hr'g Tr. 13:1-3, 14:8-25, 15:5-8, 17:10-14.

The Court of Appeals was right to acknowledge that counsel's cross-examination of Ms. McNally was not perfect. *See Krutsinger IV* at 16. It was not, and additional investigation and preparation almost certainly could have made it better. Counsel explained that he did not seek additional information about Ms. McNally's testimony because he was familiar with her and had seen her testify. 4/13/2012 Postconviction Hr'g Tr. 116:8-13, 176:8-177:19. Relying on experience to such an extent does not give the impression of first-rate representation. *See* 9/14/2012 Postconviction Hr'g Tr. 32:21-33:15.[34] Still, I cannot find that all fair-minded jurists

---

[34]This is where counsel's hubris rears its ugly head. He assumed he did not need to interview Ms. McNally, obtain transcripts of her prior testimony, or investigate her biases because he knew what she was about and what she was going to say. The most glaring instance of his hubris, though, is that he did not bother to consult an expert for assistance. He provides no justification for that decision. Even so, my purpose here "is not to grade counsel's performance." *Strickland*, 466 U.S. at 697. Instead, I must grant the state court "deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself" and "must

would agree that the Court of Appeals was incorrect in concluding that counsel's handling of the prosecution's expert was not outside the bounds of reasonableness.

Counsel sought to discount Ms. McNally's testimony and expertise altogether, and as the state courts found, he was able to show her bias favoring individuals reporting abuse and that her testimony lacked any real substance.[35]  Considering counsel's aim of discrediting Ms. McNally, it made sense for him not to plan on eliciting testimony from her on the defense's theories, e.g., if and why false allegations occur.

Mr. Krutsinger looks to *Barkell v. Crouse*, 468 F.3d 684 (10th Cir. 2006), and *Gersten v. Senkowski*, 426 F.3d 588 (2d Cir. 2005), for support. In *Barkell*, a divided panel of the Tenth Circuit held that the defendant had sufficiently alleged that his trial attorney was deficient in his pretrial investigation such that defendant was entitled to an evidentiary hearing in the federal district court. 468 F.3d at 698. Like Mr. Krutsinger, the defendant in that case was convicted of sexually assaulting his stepdaughter. *Id.* at 687. The defendant claimed that his attorney never

---

determine what arguments or theories supported . . . the state court's decision." *Harrington*, 562 U.S. at 101-02.

[35]Mr. Krutsinger places great significance on his trial counsel's failure to discover and cross-examine Ms. McNally with a statement she had made during an interview with CNN, purportedly calling for "a war on sex offenders." During her postconviction testimony, Ms. McNally explained that the statement should not be used out of context, so Mr. Krutsinger's present counsel read the related portion of her interview. 6/15/2012 Postconviction Hr'g Tr. 26:24-27:7. In it, she stated:

> While I think that the problem is a bigger problem and it has to do with sort of society's denial of how serious this crime is and how it devastates human lives and that in the same way that we've decided we're going to have a war on drugs or we're going to have a war on drunk drivers, that we need to have a war on sex offenders, and it needs to be taken absolutely seriously, and judges need to be monitored and that, when laws are written, we're absolutely sure that they are good laws and laws that are going to stand up.

*Id.* 27:11-20. Ms. McNally did not call for an unauthorized, illegitimate "war" on sex offenders; she opined that the crime should be taken seriously by the criminal justice system. Any bias that statement reveals was exposed by Mr. Krutsinger's trial counsel. *See, e.g.*, 8/21/2003 Trial Tr. 64:17-65:1.

attempted to speak with the victim's school counselor or teacher, who could have impeached her credibility. *Id.* at 692. And, as relevant here, the defendant alleged that his attorney failed to consult with or call an expert witness on child psychiatry, who could have explained to the jury how to evaluate children's testimony and could have identified problems with the testimony of the prosecution's expert. *Id.* at 698. Significantly, the Tenth Circuit majority found that it was not ineffective assistance to fail to call the expert as a witness, but that "consultation to assist in cross-examination [was] another matter." *Id.* at 699. During his cross-examination of the prosecution's expert, the attorney imprudently asked whether children in stepparent families were more likely to be abused than other children, which "elicited a damaging affirmative answer." *Id.* The majority expressed uncertainty as to whether the failure to consult an expert alone would have warranted remand for an evidentiary hearing but held that it should be included in the hearing along with the allegations regarding the attorney's failure to investigate. *Id.*

In *Gersten*, the Second Circuit held that "[d]efense counsel's lack of preparation and failure to challenge the credibility of the key prosecution witness" constituted deficient performance and "could not be based on a sound trial strategy." 426 F.3d at 611. The court criticized counsel for "fail[ing] to consult or call an expert on the psychology of child abuse, or to educate himself sufficiently on the scientific issues." *Id.* The prosecution's expert in psychology testified primarily about Child Sexual Abuse Accommodation Syndrome, which lacked any scientific validity in the way the expert utilized it, a fact the defendant's attorney would have discovered with "even a minimal amount of investigation. *Id.* at 596, 611. Nevertheless, the court specifically stated: "[T]here is no *per se* rule that requires trial attorneys to seek out an expert. We do not even mean to hold that expert consultation is always necessary

in order to provide effective assistance of counsel in child sexual abuse cases . . . ." *Id.* at 609 (internal quotation marks and citation omitted).

I find the case put forward by Respondents—*Ellis v. Raemisch*—is more instructive in this case than *Barkell* or *Gersten*. In *Ellis*, the defendant was convicted of sexually assaulting his adopted daughter in Colorado state court and, on habeas review, asserted that his trial attorney provided ineffective assistance by not calling a forensic psychologist as an expert witness, among other failures. 872 F.3d at 1069, 1075. Reversing the district court's grant of relief, the Tenth Circuit panel held that the state courts were not unreasonable in their adjudication of the defendant's ineffective-assistance claim. *Id.* at 1094. The panel noted trial counsel's belief that he could convey the relevant psychological theories to the jury without expert testimony and determined that it was not unreasonable for the Colorado Court of Appeals to conclude that trial counsel's "decision to not consult or call as a witness a forensic psychologist was strategic and reasonable." *Id.* at 1086. While there were no specific theories counsel here sought to convey to the jury, he was able to poke holes in the theories espoused by the prosecution's expert. So, as the majority concluded in *Ellis*, it was not unreasonable for the Court of Appeals to conclude that trial counsel's tactical decisions related to cross-examining the prosecution's witness were within the range of reasonable professional assistance.

This leads to Mr. Krutsinger's second criticism of his trial attorney in connection with the prosecution's expert—that his counsel should have called a defense expert in order to properly rebut Ms. McNally's testimony. On this argument, the Court of Appeals wrote:

> [Mr. Krutsinger's trial counsel] testified that based on his years of experience, he has found that "when the People have generalists as experts, many jurors find that is not helpful and they disregard it," and "when the defense calls an expert, . . . [the jurors] believe the expert is simply a hired gun." Thus, in his experience, there is generally a bias against defense experts, and the prosecution can play on that bias.

With regard to this case in particular, [counsel] explained that he did not employ an expert witness because (1) the expert would have been a generalist and would not have had a chance to examine the victim before trial; (2) the victim had actually seen a psychologist that he planned to present as an expert to impeach the victim, but the trial court later precluded her from testifying; and (3) generalists who testify as defense experts, in his experience, tend to be more interested in the money than the science and often do not fare well on cross-examination. [Mr. Krutsinger's effective-assistance expert] disagreed, testifying that [counsel]'s failure to consult with and hire an expert witness fell below the standard of care and prejudiced [Mr.] Krutsinger.

Considering the testimony of [counsel] and [the effective-assistance expert], the postconviction court ultimately disagreed that the retention of an expert witness is "mandated in every sexual assault on a child case." It concluded that the decision to call an expert witness was a strategy decision to be made, "based upon the experience of trial counsel and the nature of the evidence for and against the defendant." And it concluded [counsel]'s decision not to do so was not constitutionally deficient.

"*Strickland* does not enact Newton's third law for the presentation of evidence, requiring for every prosecution expert an equal and opposite expert from the defense." *Harrington*, 562 U.S. at 111. Indeed, cross-examination is often sufficient to expose defects in an opposing expert's presentation. *See id.* And we agree with the postconviction court that the decision whether to call an expert was within [counsel]'s strategic purview. *See, e.g.*, *People v. Aguilar*, 2012 COA 181, ¶ 12 (defense counsel's decision not to call an expert to contest DNA evidence was a matter of trial strategy); *People v. Bradley*, 25 P.3d 1271, 1276 (Colo. App. 2001) (deciding not to call an expert witness is tactical and within trial counsel's discretion).

The record thus supports the postconviction court's finding that in light of [counsel]'s "experience, and his familiarity with and prior examination of the [prosecution's] expert witness," [Mr.] Krutsinger did not establish that the "decision not to retain or use an expert . . . falls outside the wide range of professionally competent assistance."

*Krutsinger IV* at 17-19.

Mr. Krutsinger insists that the Court of Appeals unreasonably applied *Strickland* in

determining that counsel's failure to call a defense expert was not deficient performance. Again,

I cannot find that all fair-minded jurists would view the court's decision as incorrect. "Generally

the decision whether to call a witness rests within the sound discretion of trial counsel." *Jackson*

*v. Shanks*, 143 F.3d 1313, 1320 (10th Cir. 1998). Counsel must be afforded deference in that respect. Had counsel known that Dr. Howard would not be permitted to testify, perhaps counsel would have believed it was necessary to consult or call an expert. But I must limit my analysis to counsel's perspective at the time and "eliminate the distorting effects of hindsight." *Strickland*, 466 U.S. at 689. Following that direction, I recognize that counsel's performance concerning the prosecution's expert was not exemplary but conclude that the Court of Appeals did not assess it in an unreasonable manner.

*7. Decision Not to Challenge Evidence of Other Crimes, Wrongs, or Acts*

Mr. Krutsinger additionally complains about his counsel's decision not to challenge the evidence presented by the prosecution under Colorado Rule of Evidence 404(b).[36] The Court of Appeals concluded, as I preliminarily did above, that counsel's overall strategy, which entailed using evidence of the Krutsingers' fights, was not unreasonable. It reasoned:

> [Mr. Krutsinger's trial attorney] testified that he (1) believed the evidence of the altercations would be admissible as res gestae; and, in any event, (2) wanted to use the evidence to support his defense theory. Specifically, counsel wanted to use the evidence to demonstrate that the victim witnessed the altercations, disliked how [Mr.] Krutsinger treated her mother, and fabricated the sexual abuse allegations to get away from [Mr.] Krutsinger and protect her mother. [Counsel] testified that he conferred with [Mr.] Krutsinger about using the evidence as part of the defense. [Counsel] also explained that he intended to have [Mr.] Krutsinger testify about the altercations, including testimony that it was the victim's mother who was arrested for domestic violence and ordered to engage in anger management.

---

[36]That Rule provides:
> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

Colo. R. Evid. 404(b).

> The record supports the postconviction court's finding that evidence of the altercations was part of Mr. Truman's trial strategy. *See Jackson v. State*, 701 S.E.2d 481, 486 (Ga. Ct. App. 2010) ("[G]enerally, counsel's decision as to which theory of defense to pursue is considered strategic and cannot serve as the basis for an ineffective assistance claim.") (alteration in original) (citation omitted); *accord People v. Sims*, 869 N.E.2d 1115, 1144 (Ill. App. Ct. 2007). And we agree that [counsel]'s strategy, though ultimately unsuccessful, was not unreasonable. Thus, we perceive no error in the postconviction court's finding that [Mr.] Krutsinger failed to establish that [his trial counsel] was ineffective "in attempting to present evidence that established a motive for the victim to fabricate the sexual assault allegations."

*Krutsinger IV* at 19-21.

Mr. Krutsinger contends that the Court of Appeals "unreasonably applied *Strickland* in determining that it was a reasonable strategy for [counsel] to introduce highly prejudicial, inadmissible evidence of violent criminal acts allegedly committed by his client." Am Pet. at 79. Mr. Krutsinger argues counsel's conduct was the result of inattention, not strategy. In particular, he condemns counsel's decision not to request notice from the prosecution of any evidence of other crimes, wrongs, or acts it intended to present under Rule 404(b) and counsel's choice not to request a limiting instruction for that evidence. Mr. Krutsinger points to the testimony of his effective-assistance expert that the "rock bottom standard" for criminal attorneys was to at least request notice under Rule 404(b) from the prosecution. 9/14/2012 Postconviction Hr'g Tr. 50:25-51:23.

Without a doubt, it is the unusual case in which it could be considered reasonable for defense counsel not to request notice under Rule 404(b). But this is that case. Counsel knew the general nature of the evidence the prosecutor might present under Rule 404(b) and had determined that it would benefit Mr. Krutsinger's defense. As for counsel's decision not to seek a limiting instruction, there was no reason for him to do so. He intended for the evidence to be used by the jury for purposes other than those listed under Rule 404(b). And he believed the

evidence would come in as res gestae. 4/13/2012 Postconviction Hr'g Tr. 146:21-23.

Mr. Krutsinger cites the Colorado Supreme Court case *People v. Spoto*, 795 P.2d 1314 (Colo. 1990), to illustrate that the admission of Rule 404(b) evidence is highly prejudicial. But, in *Spoto*, the defendant was convicted of committing first degree murder by shooting a man and the evidence in question related to his prior crime of brandishing a firearm. *Id.* 1315-16. There was no suggestion that that evidence could have benefited the defense or that it was res gestae.

As I stated above, I find that counsel's trial strategy was reasonable. Part of that strategy included permitting evidence of the Krutsingers' fights to show the jury a potential motive S.M. had for fabricating her allegations against Mr. Krutsinger. Counsel testified that he did not make the decision lightly to incorporate that theory into his overall strategy but that he and Mr. Krutsinger agreed to do so after lengthy discussion. 4/13/2012 Postconviction Hr'g Tr. 147:12-24, 186:10-15. Counsel explained that, in his experience, it was necessary to give the jury a reason why an adolescent would make up such a story and that trying to separate herself and her mother from Mr. Krutsinger was all he and Mr. Krutsinger could come up with. *Id.* 147:5-16. In hindsight, it is apparent the jury did not buy this theory and that it was not argued in the most skilled way. But it was not an unreasonable trial strategy at the time. The jury needed a narrative, and it was not illogical to decide that this was one of the most believable motives S.M. had for fabricating her allegations.

"There is a 'strong presumption' that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than 'sheer neglect.'" *Harrington*, 562 U.S at 109 (quoting *Yarborough*, 540 U.S. at 8). Counsel's tactics related to evidence of the Krutsingers' fights were applied properly and in furtherance of the defense's reasonable trial strategy. Therefore, I cannot find that all fair-minded jurists would agree that the Court of Appeals' *Strickland* analysis on this

alleged error was incorrect.

*8. Decision Not to Challenge the Admissibility of Hearsay Statements*

Mr. Krutsinger also argues that his counsel was deficient in failing to object to the admissibility of out-of-court statements that were presented to the jury, including (1) statements by the forensic interviewer in the video of S.M. that was shown to the jury and (2) S.M.'s repeated statements to her mother that she had a secret. The Court of Appeals rejected this argument on the grounds that the evidence was admissible or otherwise not prejudicial. *Krutsinger V* at 19. In finding the forensic video was admissible and otherwise not prejudicial, the court explained:

> We agree with the postconviction court that the forensic video was admissible, but on different grounds. *People v. Glover*, 2015 COA 16, ¶ 22 ("[A]n appellate court 'may affirm a [district] court's ruling on grounds different from those employed by that court, as long as they are supported by the record.'" (quoting *People v. Chase*, 2013 COA 27, ¶ 17)). The forensic video interview was admissible under [Colorado Rule of Evidence] 801(d)(1)(B) because defense counsel generally attacked the victim's credibility and the video was relevant and admissible to give the jury a complete picture of her credibility. *People v. Miranda*, 2014 COA 102, ¶ 16. To the extent we assume one portion of the video shouldn't have been admitted, the error wasn't prejudicial because it was cumulative of other trial testimony.

> In *Miranda*, another division of this court concluded that a victim's forensic interview was admissible in its entirety under CRE 801(d)(1)(B) where defense counsel "made 'a general attack on the victim's credibility.'" *Id.* at ¶ 18 (quoting *People v. Halstead*, 881 P.2d 401, 403-04 (Colo. App. 1994)). In *Miranda*, defense counsel attacked the victim's credibility and motivation, in part by generally questioning her relationship with her mother. The *Miranda* division concluded that where "'the prior statements were relevant and admissible to give the jury a complete picture of [her] credibility,' the trial court acted well within its broad discretion in admitting the entire recorded interview." *Id.* at ¶ 20 (quoting *People v. Banks*, 2012 COA 157, ¶ 39). This included the forensic interviewer's comments that "our job is to make sure that you are safe and that doesn't happen to you again. Because what you did was not your fault. He's the grownup . . . . And it's not okay to do that to kids." *Id.* at ¶ 95.

> We agree with *Miranda*'s rationale and reach the same result here. [Mr.]

Krutsinger's counsel similarly attacked the victim's credibility, including using her relationships with her mother and [Mr.] Krutsinger as a motive for her to lie. Defense counsel's theme in opening statements was "listen for the lie," and he argued that the victim had lied to her parents, classmates, school counselors, and teachers about numerous topics. Allowing the jury to view the entire forensic interview gave them "a complete picture of [the witness's] credibility" and placed the testimony in context. *Id.* at ¶ 16 (quoting *Bank*s, ¶ 39); *see also Davis v. People*, 2013 CO 57,  ¶ 19 (forensic interviewer's comments in an interview video are generally admissible to provide context); *People v. Clark*, 2015 COA  44, ¶ 126 ("Determining 'how much of a prior consistent statement  is admissible is based upon its relevance and probative use' which  'turns on the scope of impeachment and the attack on the witness's  credibility.'" (quoting *Miranda*, ¶ 15)).

Any unfair prejudice from viewing the entire video, including the forensic interviewer's comments, didn't substantially outweigh the highly probative value of corroborating the victim's in-court testimony. *See Whitman*, 205 P.3d at 381 ("Because attacking the credibility of the child witnesses was the axis around which the defense spun, providing corroboration for their in-court testimony with the out-of-court statements was highly probative. Whatever prejudicial effect resulted from the admission of these statements  was not unfair, nor was any unfair effect substantially greater than the probative effect.").

And even if we assume the victim's video interview statement  that [Mr.] Krutsinger had been violent toward her mother wasn't admissible under CRE 801(d)(1)(B), both the victim and her mother testified to this at trial, so [Mr.] Krutsinger wasn't prejudiced by defense counsel's failure to object. *See People v. Melendez*, 80 P.3d 883,  889 (Colo. App. 2003) (admission of videotaped interview under  section 13-25-129 not unfairly prejudicial where its substance did  not differ significantly from testimony presented at trial), aff'd, 102  P.3d 315 (Colo. 2004).

*Krutsinger V* at 19-22. Regarding Mrs. Krutsinger's testimony that S.M. had repeatedly told her over the years that she "had a secret," the court held it was admissible as a prior consistent statement under [Colorado Rule of Evidence] 801(d)(1)(B) to rebut defense counsel's claims that [S.M.]'s allegations of sex assault were a recent fabrication." *Id.* at 22-23.

Mr. Krutsinger argues that the court unreasonably applied *Strickland* and *Crawford v. Washington*, 541 U.S. 36 (2004), in holding that counsel was not ineffective because the evidence in question was admissible or otherwise not prejudicial. In *Crawford*, the Supreme Court announced that, "where testimonial statements are at issue, the only indicium of reliability

sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation." *Id.* at 68-69. Mr. Krutsinger fails to explain how *Crawford* is applicable here, and I decline to make such arguments for him.

The Court of Appeals held that S.M.'s statements that she "had a secret" were not hearsay and were admissible as prior consistent statements under the Colorado Rules of Evidence. *Krutsinger V* at 22-23. I see no constitutional implication and agree that counsel was not deficient in failing to object to that evidence.

As for S.M.'s video interview, the Court of Appeals held that S.M.'s statements in the video were admissible because the defense had challenged her credibility and so the jury was entitled to a full picture of that credibility. *Id.* at 20-21. The Court determined S.M.'s statements regarding the Krutsingers' fights fit in that picture and that any prejudice from those statements or those of the interviewer was outweighed by the video's strong probative value. *Id.* at 20-21. These evidentiary rulings by the state court are not unreasonable. Indeed, Mr. Krutsinger does not dispute the propriety of these rulings. Instead, he merely states that I am not bound by them and continues to argue that counsel should have objected under the child-hearsay statute. *See* Reply at 28.[37] Since the evidence was otherwise admissible, however, counsel cannot be judged deficient for believing that the evidence was in fact admissible and not objecting, *see* 4/13/2012 Postconviction Hr'g Tr. 130:17-18 (testifying that he "believe[d] these statements would come in irrespective" of any objection).

In light of the evidentiary determinations by the state courts, counsel did not act unreasonably in deciding not to object to the challenged statements. And, as a result, the Court of

---

[37]He also insists that counsel should have requested the cautionary instruction set forth in the child-hearsay statute that would have informed the jurors that it is for them to decide the weight and credit to S.M.'s statements. *See* Colo. Rev. Stat. § 13-25-129(6). Requesting such a jury instruction is a matter of tactical discretion for trial counsel.

Appeals' decision is not unreasonable.

*9. Decision Not to Object to Prosecutor's Statements During Closing Arguments*

Lastly, Mr. Krutsinger argues that it was unreasonable for his trial counsel not to object to the prosecutor's questionable statements during closing arguments. Much of the Court of Appeals' reasoning on this aspect of Mr. Krutsinger's fourth claim is set out above in my discussion on his second and third claims dealing with prosecutorial misconduct. The Court of Appeals found that the prosecutor's comments regarding a "diabolical" plot and "the pit of hell," his summary of Mr. Lantz's testimony, and his statement addressing the victim's credibility were not improper, and therefore counsel's failure to object to them was not deficient. *Krutsinger IV* at 25; *Krutsinger V* at 13-16. Regarding the prosecutor's reference to Mr. Krutsinger's not-guilty plea as a "lie," the court concluded that it did not prejudice him such that there is a reasonable probability that the trial's outcome would have been different. *Id.* at 16-17. Similarly, the court found that, even if the prosecutor's characterization of Ms. McNally's testimony was improper, "the difference in wording between the prosecutor's phrase and the expert's was immaterial, [so it] perceive[d] no prejudice to [Mr.] Krutsinger caused by defense counsel's decision to not object." *Id.* at 11-12. Additionally, the court held that the prosecutor's insinuation that Mr. Krutsinger had lied about meeting with Mr. Lantz was improper, but that it was not so significant or prejudicial that counsel was constitutionally deficient in not objecting to it. *Id.* at 9-10.

Mr. Krutsinger asserts that the court unreasonably determined the facts and unreasonably applied *Strickland* in holding that counsel's failure to object during closing arguments was a reasonable strategic decision and not prejudicial. In support of those challenges to the Court of Appeals' decisions, he claims that his trial counsel "erroneously belie[ved] that Colorado law

does not distinguish between appellate review of preserved and non-preserved errors regarding closing arguments." Am. Pet. at 72. And he contends that his counsel's ignorance made him incapable of making a reasonable strategic decision meriting deference.

Mr. Krutsinger misconstrues his counsel's testimony. The Court of Appeals accurately summarized it, stating:

> [Defense counsel] said he didn't agree with the school of thought that "defense lawyers should object whenever and however they can object." Instead, his strategy for objection was based on his experience that "I believe that you pay for every objection whether it's in credibility or in flow. And so . . . if there's an objection, it has to be sustained for your credibility, and I don't take objections lightly." He also said he felt that trial court judges generally only sustain closing argument objections if the statement is "outrageous." And he felt that even if an objection was sustained, curative instructions weren't "as powerful" as he would like, minimizing their effectiveness as compared to the potential harm in objecting. He said he "came close" to objecting to some of the prosecutor's statements at closing arguments but "decided not to make the objection to highlight [those statements]."

*Krutsinger V* at 8-9. On objecting during closing to ensure a more favorable standard on appeal, counsel explained that he believed "if it's bad enough to get a reversal with an objection, it will be bad enough to be plain error." *Id.* 124:11-14. He also explained that he was afraid to object even when the prosecutor was saying something false, because courts often rule that a prosecutor is allowed to make argument and the jury can decide what is true or not. 4/13/12 Postconviction Trial Tr. 204:17-205:15.

I agree that it was a reasonable tactic for counsel not to object unless the prosecutor made an egregious statement. As counsel testified, there are legitimate reasons not to object during argument, such as the risk of losing credibility with the jury (or the judge) and the likelihood of highlighting a damaging point. Counsel was rightly focused on his trial strategy and the impact any objection would have on the jury. Consequently, the Court of Appeals did not make an unreasonable determination of fact.

In discussing Mr. Krutsinger's prosecutorial-misconduct claims above, I resolved that the Court of Appeals reasonably applied the law and that the prosecutor's statements did not violate Mr. Krutsinger's rights to due process and a fair trial. Based on counsel's explanations and my previous discussion of the alleged prosecutorial misconduct, I similarly conclude that the Court of Appeals' analysis regarding counsel's decisions not to object during closing argument is not unreasonable.

Considered as a whole, it is evident that the performance of Mr. Krutsinger's trial attorney was not exceptional. And perhaps it depended too much on experience and not enough on preparation. But it was the product of a coherent and reasonable strategy. Counsel did not simply mix in this and then that without care or direction. In sum, I find no grounds for holding that the Court of Appeals' adjudication of Mr. Krutsinger's ineffective-assistance-of-counsel claim was contrary to or involved an unreasonable application of federal law or was based on an unreasonable determination of the facts. So, as with his other three claims, I deny relief.

## IV. Conclusion

Accordingly, Mr. Krutsinger's Amended Petition for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 (ECF No. 24) is DENIED.

Under 28 U.S.C. § 2253(c), a petitioner may not appeal the denial of his habeas application without a certificate of appealability. The exclusive basis for issuing a certificate of appealability is "if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c). "Such a showing is made only where a prisoner demonstrates 'that jurists of reason would find it debatable' that a constitutional violation occurred, and that the district court erred in its resolution." *United States v. Pinson*, 584 F.3d 972, 975 (10th Cir. 2009)

(quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). On Mr. Krutsinger's first claim, I find that jurists of reason could debate my conclusion that the error did not have a substantial and injurious effect on the jury's verdict. Regarding his second and third claims, I find their lack of merit to be beyond debate. Lastly, although the question—whether reasonable jurists could debate whether all fair-minded jurists would agree that the Court of Appeals' decisions were incorrect—is tortuous, I conclude Mr. Krutsinger has made a substantial showing of the denial of a constitutional right on his fourth claim. Thus, a certificate of appealability is GRANTED for Mr. Krutsinger's first and fourth claims and DENIED for his second and third claims.

DATED this 28th day of October, 2020.

_John L. Kane_

JOHN L. KANE
SENIOR U.S. DISTRICT JUDGE